[No. B224853. Second Dist., Div. Three. Mar. 7, 2011.]

In re D.R. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
R.R., Defendant and Appellant.

[No. B225198. Second Dist., Div. Three. Mar. 7, 2011.]

In re D.R. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
J.C., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The opinion is ordered published in its entirety except for Discussion, parts 1., 2., 3., 4., 6. and 7.

1496

## COUNSEL

Joseph D. MacKenzie, under appointment by the Court of Appeal, for Defendant and Appellant R.R.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant J.C.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

KLEIN, P. J.—J.C. (mother) appeals an order terminating her parental rights as to M.R. and D.R. and the summary denial of petitions for modification. (Welf. & Inst. Code, § 388.)[1] Mother contends the denial of her section 388 petitions was an abuse of discretion, and the juvenile court erred in denying mother's request for a continuance of D.R.'s permanency planning hearing and in terminating mother's parental rights as to both children.

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

R.R. appeals the denial of a section 388 petition with respect to D.R. He also contends the juvenile court erroneously denied his request for a continuance of D.R.'s permanency planning hearing and improperly terminated his parental rights.

We affirm the orders of the juvenile court.

## FACTUAL AND PROCEDURAL SUMMARY[2]

### 1. *Mother's dependency history.*

Mother came to the attention of the Los Angeles County Department of Children and Family Services (the Department) in May of 2005 when a dependency petition was filed with respect to mother's five oldest children. As sustained, the petition alleged mother had a nine-year history of methamphetamine abuse and mother left her youngest child at the hospital without making plans for the child's care. Mother failed to reunify with these children and her parental rights were terminated in April of 2008.

### 2. *M.R.'s dependency case.*

In October of 2008, the Department filed a dependency petition with respect to newborn M.R. The petition alleged mother had a 12-year history of methamphetamine abuse, mother failed to reunify with M.R.'s siblings and mother failed to participate in court-ordered substance abuse treatment programs and random drug testing. Mother completed a drug treatment program in March of 2009. M.R. was returned to mother in May of 2009 under a family maintenance plan. However, at the end of July 2009, the Department again detained M.R. based on mother's failure to assure M.R.'s attendance at regional center appointments, failure to provide a stable home despite receiving services from four social agencies, and failure to keep the Department informed of mother's address and telephone number.

### 3. *The detention of D.R.*

D.R. was born in November of 2009. The Department detained the child at the hospital because there had been no change in mother's circumstances after M.R. was removed from mother's care three and a half months earlier.

---

[2] We have taken judicial notice of the record on appeal in *J.C. v. Superior Court* (May 13, 2010, B222099) (nonpub. opn.).

Mother was under a court order to drug test but she missed four drug tests during her pregnancy.

Mother advised hospital staff that R.R. was D.R.'s father and that mother and R.R. lived together. However, hospital social worker Dancy indicated R.R. denied being D.R.'s father, denied being mother's "significant other" and refused to sign D.R.'s birth certificate. Dancy stated mother and R.R. "appeared to be arguing a lot, throughout the day, he kept leaving the [hospital] room upset. . . ." R.R. requested unsupervised contact with the infant. When he was informed he could only visit in the nursery, R.R. became upset and stated he did not wish to visit the child.

In the hospital room, R.R. told a social worker he would do what he needed to do to care for D.R. However, R.R. declined to hold D.R. before leaving the hospital, stating he would "just watch her through the window." When the social worker advised R.R. he would be included in the detention report as D.R.'s alleged father, R.R. said he did not wish to be involved in court proceedings.

The detention report indicated R.R. refused to take parenting classes or participate in family preservation services when they were offered to him with respect to M.R. Also, the foster family agency reported R.R. was intimidating, argumentative and threatening during mother's visits with M.R. The Department placed D.R. in a preadoptive foster home and recommended monitored visitation for mother and R.R.

### 4. *Detention hearing.*

At the detention hearing on November 19, 2009, in response to questions from the juvenile court, mother indicated R.R. was D.R.'s father. Mother stated she was not married to R.R. at the time of D.R.'s birth and his name is not on the child's birth certificate. However, R.R. has held himself out as the child's father, no one else could be the father of the child, and R.R. supported mother throughout the pregnancy.

The juvenile court found R.R. was D.R.'s alleged father and, over mother and R.R.'s objection, ordered R.R. to appear for HLA (human leukocyte antigen) paternity testing. The juvenile court ordered the Department to provide reunification services to mother and R.R., including weekly random drug testing. The juvenile court granted mother and R.R. twice weekly monitored visits with D.R. In response to a request by D.R.'s counsel, the juvenile court ordered mother and R.R. to visit D.R. separately.

### 5. *The jurisdiction/disposition report.*

Mother told the social worker she had been participating in a drug program and had been sober for about one year. Mother indicated M.R. is a regional center client because the child "has stiff arms and requires physical therapy." Mother stated she missed M.R.'s first therapy session because mother got lost. Mother rescheduled but arrived late and no one was there.

The Department noted mother was attending domestic violence classes and drug treatment with random drug testing and that she had completed parenting and anger management classes.

### 6. *Termination of reunification services with respect to M.R.*

On December 14, 2009, the juvenile court received into evidence the social reports, evidence of mother's compliance with the case plan and the HLA test results indicating R.R. is the biological father of D.R. As to M.R., the juvenile court terminated family reunification services and set a permanency planning hearing. As to D.R., the juvenile court continued the matter for a contested jurisdictional hearing.

### 7. *Social reports filed in advance of D.R.'s jurisdictional hearing.*

The social worker visited mother and R.R. on December 29, 2009. R.R. continued to deny paternity and stated he did not want the social worker to visit him. R.R. indicated he would not participate in a drug program or random testing. R.R. indicated "it had not grown within him" to visit D.R.

On January 14, 2010, R.R. came to the Department office and stated he wanted to "step it up" and reunify with D.R. However, R.R. continued to refuse to participate in programs, drug test or visit the child stating, "If I have to have supervised visits, I would rather not see her at all."

### 8. *Jurisdictional hearing; disposition.*

At a contested hearing on January 29, 2010, R.R. testified he visited D.R. for "a few minutes" after mother's last two visits. R.R. had not attended any programs but had drug tested twice in the past two weeks and would attend a drug program if it were required. R.R. denied he refused to hold D.R. at the hospital or that he denied paternity after the HLA test results were known. R.R. testified he was "pretty sure" he was D.R.'s father and indicated he was willing to sign a declaration of paternity.

Mother testified she attends her programs, has not tested positive and has learned to live without drugs and to avoid domestic violence. Mother asserted she is a better person and is capable of caring for D.R.

The juvenile court sustained D.R.'s dependency petition, noting mother's housing remained unstable, and denied mother family reunification services under section 361.5, subdivision (b)(10), (11) and (13).

Regarding R.R., the juvenile court found he had not stepped forward and had only visited the child in the last two weeks and even then, only "to stick his head in [at the end of mother's visits] to see his child then leave. That is it." The juvenile court noted R.R. was informed on December 14, 2009, that he is D.R.'s biological father. However, R.R. told the social worker two weeks later he still was not sure and he was not going to do any programs. When counsel indicated R.R. would sign a declaration of paternity, the juvenile court noted that, at the present time, R.R. was only an alleged father and, as such, was not entitled to family reunification services. The juvenile court denied R.R. family reunification services under section 361.5, subdivision (a) and set a permanency planning hearing for D.R.

9. *Writ review of the order setting D.R.'s permanency planning hearing.*

Mother and R.R. sought writ review of the juvenile court's order of January 29, 2010, setting a hearing under section 366.26 as to D.R. (Cal. Rules of Court, rule 8.452.) In *J.C. v. Superior Court, supra,* B222099, this court denied the petitions.

10. *Social reports submitted for M.R.'s permanency planning hearing.*

A social report prepared for M.R.'s permanency planning hearing indicated 17-month-old M.R. was a regional center client who received services twice a week and appeared to be developing well. After M.R. was redetained from mother in July of 2009, she was placed with prospective adoptive parents who reported she was happy, they loved her and they wanted the best for her.

The report indicated mother failed to visit M.R. regularly after M.R. was redetained. Also, mother brought R.R. with her to visits with M.R., causing disruption.[3] As a result, R.R. was no longer permitted to visit M.R.

On February 24, 2010, the social worker reported mother's visits "go well." During the visits, M.R. and mother play and read books and mother changes M.R.'s diaper. However, the foster mother (foster mother) reported M.R. becomes "quite anxious and withdrawn" on the drive to the visit.

---

[3] At a visit on August 26, 2009, R.R. tried to hold M.R., who did not want to go to him. R.R. became upset and mumbled under his breath. When the prospective adoptive parents asked R.R. to wait until the social worker was present, R.R. became verbally aggressive to the point security had to be called and R.R. was asked to wait outside until the end of the visit.

After visits, M.R. is clingy and fretful and often has difficulty sleeping for a few nights.

A report filed for M.R.'s section 366.26 hearing on April 12, 2010, indicated M.R. had adjusted well to her prospective adoptive home and had become part of the family. M.R. appeared bonded to her prospective adoptive parents and happy in their care. M.R.'s prospective adoptive parents were married in 2003 and have a son one year older than M.R. The children attend preschool in the morning. The prospective adoptive parents have a stable income and live well within their means. The prospective adoptive mother works from home and has an assistant who helps care for the children. The prospective adoptive parents reported M.R. has difficulty sleeping at times and this usually happens after a visit with mother. The Department recommended termination of parental rights and placement of M.R. for adoption.

11. *Mother's section 388 petition with respect to M.R.*

On April 9, 2010, mother filed a section 388 petition with respect to M.R. Mother asserted she had complied with court orders in that she had finished a domestic violence program, a substance abuse program, a 12-week parenting and anger management program, has tested negative for drugs for the past year and has attended NA/AA meetings twice per week for over a year. Mother asserted she visited weekly, had a strong bond with M.R. and it would be in the best interest of the child to be reunified with mother who "has turned her life around." Mother requested reinstatement of family reunification services.

12. *Denial of mother's section 388 petition with respect to M.R.*

On April 12, 2010, the juvenile court set M.R.'s permanency planning hearing for a contest on May 26, 2010. The juvenile court denied a request by M.R.'s counsel that mother's visits be terminated or limited to once per month. The juvenile court summarily denied mother's section 388 petition for failure to state a change of circumstances and because the proposed change of order would not promote M.R.'s best interests.

13. *Social reports prepared for M.R.'s contested permanency*
 *planning hearing and D.R.'s permanency planning hearing.*

An interim review report filed May 26, 2010, for M.R.'s contested permanency planning hearing indicated the only relevant updated information

related to visitation. In that regard, foster mother reported M.R. experienced much anxiety before and after visits and that M.R. often has difficulty sleeping for a couple of nights after visits. M.R. sometimes cried inconsolably when foster mother left the visit. Foster mother decided to supervise M.R.'s visits in order to reduce M.R.'s anxiety. Foster mother reported mother has been consistent in her visitation since the last court hearing. Mother tries to interact with M.R. during visits but the child prefers to play by herself or with foster mother. At times, mother had difficulty changing M.R.'s diaper because M.R. would not let her. The social worker noted M.R. does not like to be told no and, when she gets upset, she throws tantrums in which she cries and kicks doors and walls. The social worker was concerned mother might not be able to protect M.R. during a tantrum or might react inappropriately.

On May 26, 2010, the Department also filed a status review report with respect to D.R. It noted D.R. appeared to be developmentally on target and her prospective adoptive parents report she "is a very happy, calm baby, and they love her and enjoy caring for her." Prospective adoptive parents reported that, at times, D.R. "appears restless after visits" with R.R.

Mother missed a visit with D.R. on December 1, 2009, was an hour late on December 10 and 16, 2009, and was 45 minutes late on December 21, 2009. Neither mother nor R.R. attended D.R.'s multidisciplinary assessment on December 22, 2009. However, after the jurisdictional hearing, on February 3, 2010, R.R. contacted the social worker and asked to visit D.R. R.R. stated he realizes mother "doesn't really have a chance to reunify with [D.R.] and it was up to [him] to do so." The following day, February 4, 2010, R.R. had his first visit with D.R. Although he was advised that he was entitled to a two-hour visit, he said, "it's okay, an hour works for me." R.R. thereafter visited D.R. once a week for an hour. R.R. needed coaching during the first visits on holding an infant, diaper change and bottle feeding but the visits have been appropriate and R.R. was "very attentive." R.R. missed a visit on May 6, 2010, but otherwise always arrived on time.

On March 17, 2010, R.R. indicated he was attending parenting and anger management classes. On April 26, 2010, R.R. provided a new contact number and indicated they would be moving to a new residence in Long Beach or Lakewood. Mother indicated she was participating in individual counseling.

On May 26, 2010, the Department filed a section 366.26 report which indicated D.R. was placed with prospective adoptive parents, Mrs. P. and Mrs. R., upon D.R.'s discharge from the hospital in November of 2009.

Mrs. P. is a communication specialist and Mrs. R. is an assistant professor. They have an adequate income and reside in a four-bedroom townhouse in a residential community. Their families are supportive of their plan to adopt, they have completed a 33-hour training course in parenting and their letters of reference describe them as responsible, caring and loving individuals. They have an eight-year-old daughter who is proud of being a big sister. The report indicated D.R. is attached to her prospective adoptive parents and they are committed to providing her love and security. The Department recommended termination of parental rights and adoptive placement.

14. *R.R.'s section 388 petition with respect to D.R.*

On May 18, 2010, R.R. filed a section 388 petition requesting modification of the previous order designating R.R. an alleged father and denying him family reunification services. R.R. declared he and mother had completed a voluntary declaration of paternity which had been filed with the Department of Child Support Services (DCSS). Pursuant to Family Code section 7576, subdivision (a), this declaration conclusively established R.R. as D.R.'s presumed father and, as such, he was entitled to family reunification services. R.R. argued six months of family reunification services would not disrupt D.R.'s placement and it would be in the child's best interest to have an opportunity to build a relationship with her father. R.R. attached to the petition a copy of the declaration of paternity which was signed by mother and the father (father) and witnessed by mother's counsel on January 29, 2010.

15. *Mother's section 388 petition with respect to D.R.*

On May 26, 2010, mother filed a section 388 petition with respect to D.R. which alleged the same change of circumstance stated in mother's section 388 petition as to M.R., namely, that mother had completed domestic violence and substance abuse programs as well as a 12-week parenting and anger management program, she has continued to test negative and has attended NA/AA meetings. Mother requested family reunification services in order to maintain positive ongoing contact with D.R. Mother asserted she had complied with court orders, she was now in a position to be a better parent, and D.R. was young enough to grow up in her mother's care.

16. *The combined hearings of May 26, 2010.*

On May 26, 2010, the juvenile court called the matter for a review hearing and a contested permanency planning hearing as to M.R., and section 388 petitions and a permanency planning hearing for D.R.

When the juvenile court indicated it intended to deny R.R.'s section 388 petition, R.R.'s counsel stated the voluntary declaration of paternity entitled R.R. to presumed father status. The juvenile court indicated there still had been no showing of a change in circumstances. Mother's counsel protested that mother and R.R. signed the declaration and counsel witnessed it and "mailed the form out to the state." The juvenile court denied the petition and stated R.R. was "an alleged father only."

The juvenile court then indicated it was ready to proceed with the contested permanency planning hearing as to M.R. and saw no reason why D.R.'s permanency planning hearing also could not be conducted "today as the issues are identical." When counsel for R.R. requested a contested hearing, the juvenile court responded the only relevant issue was whether an exception to adoption could be shown. Counsel for R.R. persisted that R.R. wished to testify "there is a bond between himself and [D.R.] . . . ." The juvenile court responded R.R. was present and could testify forthwith.

Mother's counsel then requested a contested hearing as to D.R. and stated counsel and mother had received a copy of the social report that morning and mother "would like to have an opportunity to prepare and offer testimony." The juvenile court suggested mother's testimony "is going to be identical for [D.R.] as it is for [M.R.]." Mother's counsel again objected mother had not had an opportunity to review the report and mother was entitled to a continuance by statute.

At that point, county counsel offered that, in an abundance of caution, the Department would not object to a brief continuance. The juvenile court found a continuance was not necessary, noted the only difference between the children was their age, and asked what different testimony mother would offer at a later time. Mother's counsel responded mother believed, "by allowing her to have more time," she would be able to obtain "more documentation regarding" her ability "to establish her bond with her child." R.R.'s counsel joined in the request and stated R.R. also did not receive the report 10 days before the hearing and case law entitled him to a continuance. The juvenile court denied the request and indicated it was prepared to proceed over mother and R.R.'s objection.

After the juvenile court received the social reports into evidence, mother testified she visits each of her children once per week for two hours. During visits, mother reads to the children and plays with them. She would like to do more but is restricted by the length of the visits and the area in which they take place. M.R. reaches out to mother, kisses her and they laugh and

play. D.R. smiles when she sees mother. Neither child seems upset during visits. M.R. has tantrums but only because she becomes upset when she does not get what she wants. Mother feeds D.R. snacks brought to the visits by foster mother. Mother believes she has a bond with each child even though she sees them only once a week. Mother wanted to participate in M.R.'s regional center activities but it was hard for mother to attend on the bus. Mother believes she has "the kind of bond that a mother and child should have, and I feel that if I had more time with them, that I can build a stronger bond with them."

R.R. testified he plays with D.R. during visits, shows her the swings and walks around the sand. R.R. believes he has a strong bond with D.R., she recognizes him and is happy to see him. She has not cried with him. R.R. asked the juvenile court to give himself and mother another chance to regain "what we had going at one point."

Mother's counsel argued mother had done the best she could to remain engaged with the children and involved in their lives. Mother worked hard to turn her life around and she now would be an appropriate parent for both girls.

R.R.'s counsel argued the Department detained D.R. based on mother's prior behavior and that R.R. consistently had asserted not only that he was D.R.'s biological father, but also that he should be her presumed father. When the juvenile court noted R.R. did not visit the child until February of 2010 and then saw the child only three or four times, counsel protested that father regularly had been attending visits, the visits were of high quality and R.R. had established a relationship with his daughter.

After the matter was submitted, the juvenile court stated that, as to mother, "this is a very sad situation" in that five of mother's children previously had been placed for adoption. The juvenile court noted both mother and R.R. had only monitored visitation and neither had demonstrated that the beneficial parental relationship exception applied. The juvenile court pointed out that, "for the first three and a half months of [D.R.'s] life, [R.R.] never saw the child." The juvenile court found, by clear and convincing evidence, both children were likely to be adopted and terminated parental rights.

## CONTENTIONS

Mother contends the juvenile court erred in denying her section 388 petitions, in denying a continuance of D.R.'s permanency planning hearing and in terminating her parental rights.

R.R. contends the juvenile court erred in denying his section 388 petition, in denying a continuance of D.R.'s permanency planning hearing, and in terminating his parental rights.[4]

## DISCUSSION

1.–4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

5. *Denial of R.R.'s section 388 petition.*

a. *R.R.'s arguments.*

R.R. contends his section 388 petition presented new evidence, namely, the voluntary declaration of paternity, which established R.R. as D.R.'s presumed father and qualified him to receive family reunification services. R.R. asserts his voluntary declaration of paternity was properly executed, witnessed and filed with the DCSS as required by Family Code section 7570 et seq. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 197–198 [59 Cal.Rptr.3d 703].)

Recounting the history of the case, R.R. claims the juvenile court apparently was determined not to recognize him as D.R.'s presumed father. He notes that, at the initial juvenile court hearing, mother informed the juvenile court that R.R. was D.R.'s father, he held himself out to be D.R.'s father, he supported mother throughout the pregnancy, and there was no one else who could be her father. Nonetheless, the juvenile court found R.R. to be merely an alleged father and ordered HLA testing to determine paternity. When mother's counsel asked whether testing would be required if R.R. submitted a voluntary declaration of paternity, the juvenile court indicated R.R. failed to sign a voluntary declaration of paternity at the hospital.

■ At the jurisdictional hearing on January 29, 2010, mother testified R.R. had never made any statements to her indicating he did not believe he was D.R.'s father. The juvenile court responded, erroneously, that R.R. denied paternity of D.R. at the initial hearing on November 19, 2009. At the disposition phase of the same hearing, R.R.'s counsel indicated R.R. was willing to sign a voluntary declaration of paternity. The juvenile court again noted R.R. did not sign a declaration of paternity at the hospital and denied R.R. family reunification services. However, a valid declaration of

---

[4] R.R. raises the last contention only in a heading of his opening brief. Although issues raised in such a perfunctory fashion need not be addressed, in deference to the gravity of the rights involved and in an abundance of caution, we address the merits of the issue.

*See footnote, *ante*, page 1494.

paternity may be made at any time after the child's birth. (*In re Mary G., supra*, 151 Cal.App.4th at pp. 198–200; Fam. Code, § 7571, subd. (d).) Thus, the juvenile court erroneously insisted the voluntary declaration of paternity had to be signed at the hospital. Further, HLA testing confirmed R.R. was D.R.'s biological father.

R.R. notes the reunification period had not expired when he filed the voluntary declaration of paternity in that no reunification services were ordered and R.R. should not have been precluded from being recognized as D.R.'s presumed father and considered for family reunification services. R.R. asserts an unwed father cannot be deprived of an opportunity to develop a parental relationship with a child born out of wedlock where the father does not deny or reject paternity as soon as he has reason to know of it and thereafter does not delay in asserting his interest in the child. (*In re Julia U.* (1998) 64 Cal.App.4th 532, 540–542 [74 Cal.Rptr.2d 920].) R.R. notes he visited D.R. every week after February 4, 2010, and the social reports indicated R.R. was appropriate and attentive to the child during visits.

R.R. concludes the juvenile court erroneously found his voluntary declaration of paternity of no effect and improperly denied his section 388 petition without a hearing.

> b. *Voluntary declarations of paternity.*

 In 1994, the Legislature amended Family Code section 7611, which generally sets forth the exclusive means for an unwed father to establish presumed fatherhood, to provide that a man is a presumed father " 'if he meets the conditions provided in . . . Chapter 3 (commencing with Section 7570) of Part 2,' " which pertains to the establishment of paternity by voluntary declaration. (*In re Mary G., supra*, 151 Cal.App.4th at p. 197.)

Family Code section 7573 states that, with exceptions not relevant here, "a completed voluntary declaration of paternity, as described in Section 7574, that has been filed with the Department of Child Support Services shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." (Fam. Code, § 7573; see *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119, 1132 [95 Cal.Rptr.3d 477]; *In re Mary G., supra*, 151 Cal.App.4th at pp. 197–198; *County of Los Angeles v. Sheldon P.* (2002) 102 Cal.App.4th 1337, 1340 [126 Cal.Rptr.2d 350]; Cal. Rules of Court, rule 5.635(c).)

 Family Code section 7574 states a voluntary declaration of paternity shall be executed on a form developed by the DCSS which must contain certain information, including statements by the parents that they have read

and understand the written materials described in Family Code section 7572; a statement by the mother that the man who has signed the declaration is the only possible father; and, a statement by the man that he is the biological father of the child, and that he consents to the establishment of paternity. (Fam. Code, § 7574, subd. (b).)

The Legislature enacted the statutes creating the declaration process to further the state's interest in establishing paternity for all children and to provide a means of establishing paternity that avoided the need for a lengthy and expensive court process. (Fam. Code, § 7570, subd. (b).) The Legislature also found: "Knowledge of family medical history is often necessary for correct medical diagnosis and treatment. Additionally, knowing one's father is important to a child's development." (Fam. Code, § 7570, subd. (a).)

Family Code section 7571, subdivision (a) directs that, before an unmarried mother leaves the hospital after giving birth, the person responsible for registering live births must provide the mother and the man she identifies as the father a voluntary declaration of paternity. Hospital staff is directed to witness the signature of the declaration and forward the signed declaration to the DCSS within 20 days. Attesting parents also may mail a notarized declaration to the DCSS "at any time after the child's birth." (Fam. Code, § 7571, subd. (d).) In addition, "Declarations shall be made available without charge at all local child support agency offices, offices of local registrars of births and deaths, courts, and county welfare departments within this state. Staff in these offices shall witness the signatures of parents wishing to sign a voluntary declaration of paternity and shall be responsible for forwarding the signed declaration to the [DCSS] within 20 days of the date the declaration was signed." (Fam. Code, § 7571, subd. (f).) Also, "Publicly funded or licensed health clinics, pediatric offices, Head Start programs, child care centers, social services providers, prisons, and schools may offer parents the opportunity to sign a voluntary declaration of paternity. . . . [These agencies] shall ensure that the form is witnessed and forwarded to the [DCSS]." (Fam. Code, § 7571, subd. (j).)

c. *R.R.'s voluntary declaration of paternity was not properly executed or filed.*

The record discloses R.R.'s voluntary declaration of paternity was witnessed by mother's attorney who was employed by Los Angeles Dependency Lawyers Inc. Attorneys appointed to represent parents in dependency proceedings are not among the individuals listed in Family Code section 7571 as statutorily authorized to witness voluntary declarations of paternity. Also, there was no evidence the declaration was forwarded to the DCSS within 20 days after it was signed, as required by the statute. It therefore appears the

voluntary declaration of paternity submitted with R.R.'s section 388 petition was not validly executed or filed.

R.R. argues mother's attorney qualifies as a proper witness of the declaration. He notes federal law requires states to adopt a voluntary acknowledgment of paternity process as a condition of receiving certain federal funds. He quotes 45 Code of Federal Regulations section 303.5(g)(1) which states: "The State must establish, in cooperation with hospitals, State birth record agencies, and other entities designated by the State and participating in the State's voluntary paternity establishment program, a program for voluntary paternity establishment services. [¶] . . . [¶] (ii) The voluntary paternity establishment services program must also be available at the State birth record agencies, and at other entities designated by the State and participating in the State's voluntary paternity establishment program. These entities may include the following types of entities: [¶] . . . [¶] (F) Legal Aid agencies, and private attorneys . . . ." (45 C.F.R. § 303.5(g)(1)(ii)(F) (2010).)

R.R. claims this regulation controls over any state statute that does not allow an attorney to participate in the voluntary paternity establishment services program. Thus, according to R.R., mother's attorney was authorized under federal law, either as a private attorney or as an attorney appointed by the juvenile court, to witness R.R.'s voluntary declaration of paternity.

■ However, the cited regulation merely *permits* a state to allow legal aid agencies and private attorneys to participate in the state's voluntary paternity establishment services program. The regulation states the entities required to establish paternity services "*may* include . . . [¶] . . . [¶] . . . [l]egal aid agencies, and private attorneys . . . ." (45 C.F.R. § 303.5(g)(1)(ii)(F) (2010), italics added.) The regulation does not *require* the states to include legal aid agencies and private attorneys in the program. Thus, Family Code section 7571, which does not include legal aid agencies and private attorneys in the voluntary paternity establishment services program, is not in conflict with the federal regulation.

R.R.'s alternative assertion, that mother's counsel was part of the court staff, similarly fails. Mother's counsel was appointed by the juvenile court to represent mother but was not part of the court staff.

Moreover, even if mother's counsel properly witnessed the declaration, there was no evidence the declaration was forwarded to the DCSS within 20 days after it was signed. R.R. claims the presumption that official duty has been performed cures the filing infirmity. (*Kevin Q. v. Lauren W., supra,* 175 Cal.App.4th at p. 1136; *In re Raphael P.* (2002) 97 Cal.App.4th 716, 738 [118 Cal.Rptr.2d 610]; Evid. Code, § 664.) However, the cases cited by R.R. are

distinguishable. In *Kevin Q.*, the voluntary declaration of paternity was witnessed by an employee of the DCSS. (Fam. Code, § 7571, subd. (f).) In *In re Raphael P.*, the declaration was witnessed by hospital staff performing their official duty under Family Code section 7571, subdivision (a), which includes forwarding the signed declaration to the DCSS within 20 days. (Fam. Code, § 7571, subd. (a).) R.R.'s declaration, unlike those at issue in *Kevin Q.* and *Raphael P.*, was not witnessed by an employee of the DCSS or hospital staff but by mother's counsel who had no statutory duty to forward it to the DCSS. Consequently, Evidence Code section 664 is not applicable here.

Based on the foregoing, we conclude R.R.'s voluntary declaration of paternity did not give rise to a presumption of paternity. However, even if we assume the declaration substantially complied with the statutory requirements, we find no abuse of the juvenile court's discretion in the denial of the modification petition.

> d. *Assuming R.R.'s voluntary declaration of paternity substantially complied with the statutory requirements, the summary denial of his modification petition does not require reversal.*

Initially, we note that at both the detention hearing on November 19, 2009, and the jurisdiction/disposition hearing on January 29, 2010, R.R.'s counsel indicated R.R. was willing to submit a voluntary declaration of paternity. However, he failed to do so. Thus, the juvenile court properly relied on the evidence in the record at the time of the disposition hearing that indicated R.R. did not qualify as a presumed father. This evidence included R.R.'s failure to acknowledge paternity at the hospital and his refusal to sign D.R.'s birth certificate. R.R. also declined to hold D.R. at the hospital and refused to make himself available to social workers. Even after testing showed he was D.R.'s biological father, R.R. continued to question his paternity. When R.R. eventually did contact the Department on January 14, 2010, he refused to participate in the case plan. Based on this evidence, the juvenile court properly concluded R.R. was merely an alleged father who did not qualify for family reunification services.

After the disposition hearing, R.R. commenced visitation of D.R. on February 4, 2010. However, even then he visited for only one hour rather than the two-hour visit the juvenile court's order permitted. R.R. did not present the voluntary declaration of paternity to the juvenile court until May 18, 2010, eight days before the permanency planning hearing. The declaration he submitted was dated January 29, 2010. Thus, R.R. had the signed declaration at his disposal for three and a half months before he brought it to the attention of the juvenile court when he filed it in connection with his section 388 petition.

■ Further, R.R. did not file the signed declaration until more than six months after D.R. was detained. The presumptive maximum term for court-ordered family reunification services for a child under the age of three years at the time of removal from the parent or guardian's care is six months from the date the child entered foster care. (§ 361.5, subd. (a)(1).) Thus, R.R. did not file the voluntary declaration of paternity until after the presumptive term of family reunification services for a child under the age of three years on the date of detention had expired.

■ "The requirement of petitioning the court for a hearing pursuant to section 388 to show changed circumstances must be viewed in the context of the dependency proceedings as a whole. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].) Once reunification services are terminated, the focus shifts from reunification to the child's need for permanency and stability, and a section 366.26 hearing to select and implement a permanent plan must be held within 120 days. (*In re Marilyn H., supra,* at p. 309.) For a parent "to revive the reunification issue," the parent must prove that circumstances have changed such that reunification is in the child's best interest. (*Ibid.*)

■ "It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529 [65 Cal.Rptr.2d 495].) The fact that the parent "makes relatively last-minute (albeit genuine) changes" does not automatically tip the scale in the parent's favor. (*Id.* at p. 530.) Instead, "a number of factors should be examined." (*Ibid.*) First, the juvenile court should consider "the seriousness of the reason for the dependency . . . ." (*Ibid.*) "A second important factor . . . is the strength of the existing bond between the parent and child . . . ." (*Id.* at p. 531.) Finally, as "the essence of a section 388 motion is that there has been a change of circumstances," the court should consider "the nature of the change, the ease by which the change could be brought about, and the reason the change was not made before . . . ." (*Ibid.*) "While the bond to the caretaker cannot be dispositive . . . , our Supreme Court made it very clear in [*In re Jasmon O.* (1994) 8 Cal.4th 398, 408, 414–422 [33 Cal.Rptr.2d 85, 878 P.2d 1297]] that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*Ibid.,* citation omitted.)

Considering these factors here, the record showed D.R. was detained because she was at risk in mother's care. The existing bond between R.R. and D.R. was weak, at best, given that she was never in his care and he showed no interest in visiting her until after he was denied family reunification services. Even then he visited only an hour a week, even though he was

permitted a two-hour visit. Finally, R.R. seeks to modify the juvenile court's previous order based on his voluntary declaration of paternity, which he could have filed at the outset of the proceedings but did not file until more than six months after the date on which D.R. was detained.

In sum, R.R.'s petition did not show that modification of the previous order would promote D.R.'s best interest. Rather, institution of family reunification services would have disrupted D.R.'s placement with her prospective adoptive family.

■ Under these circumstances, granting R.R.'s section 388 petition would have been inconsistent with the goals of the dependency proceedings. Once a case has advanced to the permanency planning stage, it is important not only to seek an appropriate permanent solution, but also to implement that solution promptly to minimize the time the child is in legal limbo and to allow the child's caretakers to make a full emotional commitment to the child. (*In re Marilyn H., supra,* 5 Cal.4th 295, 306.) Here, the juvenile court properly attempted to give D.R. a stable, permanent placement as promptly as possible.

R.R. asserts he cannot be deprived of an opportunity to develop a parental relationship with D.R. because he did not deny or reject paternity and he did not delay in asserting his interest in the child. (*In re Julia U., supra,* 64 Cal.App.4th at pp. 540–542.) However, R.R. did not promptly come forward and claim his role as D.R.'s parent. As has been noted, R.R. refused to acknowledge paternity at the time of D.R.'s birth, he continued to express uncertainty as to his paternity even after testing confirmed he was the child's father, and he delayed for months the filing of the voluntary declaration of paternity. Given these circumstances, the juvenile court properly could conclude it was not in D.R.'s best interests to modify the previous order denying R.R. family reunification services.

Thus, no abuse of the juvenile court's discretion appears in the summary denial of R.R.'s section 388 petition.

6., 7.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
.

---

*See footnote, *ante,* page 1494.

## DISPOSITION

The orders of the juvenile court are affirmed.

Kitching, J., and Aldrich, J., concurred.

On April 5, 2011, the opinion was modified to read as printed above.