Filed 4/3/14  In re J.S. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.S., Jr., a Person Coming Under the Juvenile Court Law. | B250808 (Los Angeles County Super. Ct. No. CK83807) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.S., Sr.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Margaret Henry, Judge.  Affirmed in part; reversed in part and remanded with directions.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance by Plaintiff and Respondent.

Aida Aslanian, under appointment by the Court of Appeal, for Minor.

\* \* \* \* \* \* \* \*

J.S., Sr. (father) appeals the juvenile court's orders denying his petition pursuant to Welfare and Institutions Code section 388[1] and terminating his parental rights to his minor son J.S., Jr. (J.S.). Father contends the court abused its discretion because he demonstrated both changed circumstances and that it was in the best interests of J.S. to grant the petition, reinstate services and liberalize visitation so that he could reunify with J.S. Father also contends the juvenile court failed to comply with the notice requirements of the Indian Child Welfare Act of 1978 (ICWA). (25 U.S.C. § 1901 et seq.) We agree that ICWA notice was inadequate and therefore conditionally reverse the order terminating parental rights and remand with directions to the juvenile court to order the Los Angeles Department of Children and Family Services to make reasonable inquiry regarding possible Indian ancestry, and to re-serve all requisite ICWA notices. We otherwise affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

J.S. first came to the attention of the Department in August 2010, as a newborn, when D.W. (mother), was placed in juvenile hall and failed to make plans for his care. The court ordered J.S. removed from mother's custody and placed with father. J.S. remained in father's care for almost a year. Mother failed to reunify with J.S. and her reunification services were terminated in April 2011.

In October 2011, several emergency referrals were made to the Department alleging general neglect of J.S. by P.S. (paternal grandmother), as well as possible sexual abuse. It was determined father had been incarcerated on a robbery conviction and had left J.S. in the care of paternal grandmother.

The Department filed a petition pursuant to section 300, subdivisions (b) and (g), alleging, as to father, that father was incarcerated and failed to protect and to make appropriate provisions for J.S.'s support by leaving him in the care and custody of paternal grandmother, despite the fact she was regularly under the influence of marijuana

---

[1] All further undesignated section references are to the Welfare and Institutions Code.

2

while caring for J.S., and had a criminal record for use and possession of controlled substances.

Initial interviews with the family members, including paternal grandmother who admitted to suffering from depression and back problems and regularly medicating with marijuana pursuant to a prescription, supported concerns by the Department about J.S.'s safety in paternal grandmother's home. Mother, who had lived for over a year with J.S. and paternal grandmother (in violation of the court's removal order concerning mother), reported that paternal grandmother regularly smoked marijuana in front of J.S. and had driven drunk with him in the car. The Department reported that in light of mother's prior failure to reunify with J.S., he could not be placed in her care. Father remained incarcerated. The Department detained J.S.

The detention report referenced that, in the initial dependency proceeding opened in 2010, notice was given to the United Keetoowah Band of Cherokee Indians and the United States Department of Interior, Bureau of Indian Affairs (BIA), and that, from responses received March 3, 2011, and February 28, 2011, respectively, it was determined J.S. was not an Indian child. Attachments A and B were identified in the report as consisting of the relevant notices and responses, but those attachments are not contained in the record.

At the detention hearing on November 7, 2011, the juvenile court found a prima facie case for detaining J.S. and ordered him removed from father's custody. The court also ordered the Department to make appropriate inquiry and investigate the claim of possible Indian heritage and provide the court with a report of the investigation detailing who was interviewed and the dates and places of birth of relevant relatives as far back as could be ascertained. J.S. was placed with a foster family, Mr. and Mrs. D., in mid-November 2011.

In the jurisdiction and disposition report, the Department reiterated its reference from the detention report concerning the ICWA notices sent in the earlier proceedings. The Department further reported that paternal grandmother had no information regarding her claim of Cherokee heritage, other than to provide the first and last names of her father

3

and her great-grandmother. She told the Department to speak with her sister, U.S., for possible additional biographical and family information. The Department reported that efforts to speak with paternal grandmother's sister had not yet been successful. Telephone messages had apparently not been returned. As with the detention report, the earlier notices and responses were referenced but not attached, and exist nowhere in the record.

Both father and mother signed Parental Notification of Indian Status forms denying any Indian heritage to the best of their knowledge.

At the pretrial conference hearing on December 2, 2011, the court inquired about ICWA notices. Counsel for the Department reminded the court it had found notice adequate on April 29, 2011, in the earlier proceeding. The court responded by acknowledging that father had filed a form denying Indian heritage. Counsel for the Department stated the Cherokee heritage claim had come from the paternal grandmother. Paternal grandmother and a paternal aunt were present at the hearing and advised the court their parents were deceased, and they had no additional information to provide the court. The court made a finding ICWA did not apply and continued the jurisdiction and disposition hearing to December 16, 2011.

At the jurisdiction and disposition hearing, the Department filed a first amended petition that substantially restated the original count b-1, b-2, and g-1 allegations. The amended petition also added the following allegation as count b-3: "The [child's] father [violated] the previous court order by leaving the child . . . in the care of mother . . . in the home of paternal grandmother. . . . The father's inappropriate plan endangered the child's physical health and safety, created a detrimental home environment and placed the child at risk of physical harm and damage."

Father submitted on the Department's report and mother plead no contest to the amended petition.

The court dismissed the original petition and sustained the amended petition as to all three counts pursuant to section 300, subdivision (b), and dismissed the count g-1 allegation in the interest of justice. Father was ordered to complete a parenting class and

4

to participate in counseling to address case issues. Father was granted monitored visitation. Mother was also granted services and monitored visitation, despite having previously failed to reunify with J.S. in the earlier proceeding.

In the six-month status review report, the Department reported J.S. interacted well with Mrs. D. and her biological children, and appeared to be "thriving" in the placement. Mrs. D. told the social worker J.S. was an "easygoing child" who hardly ever cried. It was noted Mrs. D. had expressed her desire to adopt J.S. The report further indicated father was released from prison on March 29, 2012, had completed 30 hours of a parenting class while incarcerated, had started counseling upon his release and was starting to visit with J.S. Mrs. D. reported the visits went well and father acted appropriately. Father's counselor informed the Department it was too early to comment on father's progress or prognosis.

At the review hearing in June 2012, the court found both mother and father to be in partial compliance with their respective case plans and granted the Department discretion to liberalize the monitored visitation.

In September 2012, the Department reported father had been arrested again and was housed at the North County Correctional Facility. Mother had also been arrested and was in custody.

In preparation for the 12-month review hearing, the Department reported father had been released on November 6, 2012, and had contacted the Department about his case. Father told the social worker he would do everything necessary to reunite with his son, would look for a part-time job and would re-enroll in counseling sessions. It was further reported J.S. was continuing to do well in the home of Mr. and Mrs. D., that their biological children were "very loving" towards J.S., and J.S. had started to call Mrs. D. " 'mommy.' " At the time of the report, mother's whereabouts were unknown and she was reported as noncompliant with her case plan.

By the time of the January 4, 2013 review hearing, father was once again found to be only in partial compliance with his case plan. Father's arrest had interrupted his visits with J.S., as well as his counseling sessions. The Department reported that father's

5

inability "to maintain a crime free lifestyle" had resulted in continuing noncompliance with the case plan and hampered the development of a quality bond with J.S. Mother's whereabouts remained unknown. The Department recommended the termination of services for both mother and father. The court terminated reunifications services for both father and mother on January 4, 2013.

The Department submitted a last minute information for the court in preparation for the February 1, 2013 progress hearing that noted, among other things, that Mr. and Mrs. D. had an approved home study.

Due to the emergency medical leave of the social worker handling the case, the Department requested a delay in the setting of the permanency planning hearing pursuant to section 366.26 to allow for completion of the requisite report. The hearing was scheduled for July 12, 2013.

On July 10, 2013, father filed a section 388 petition requesting reinstatement of services, liberalized visitation, and to take the section 366.26 hearing off calendar. Father's therapist submitted a letter explaining he had been attending, since March 25, 2013, twice weekly counseling sessions that he was paying for himself. The counselor stated father "for the most part is consistent with treatment." The counselor noted father's "therapy prognosis seems good." The court continued the permanency planning hearing to August 1, 2013, and set the same date as the hearing on father's petition. The court ordered the Department to respond to father's petition.

The July 12, 2013 status report stated J.S. was "demonstrating comfort and satisfaction in the home" of the D. family; that J.S. was bonded to his prospective adoptive family; and that adoption by Mr. and Mrs. D. remained in the best interests of the child.

The section 366.26 report stated the home study for Mr. and Mrs. D. had been approved almost two years earlier and therefore a supplement was required.

The Department's written response to father's petition stated that father had been forthcoming about his past behavior and expressed a strong desire to make amends and reunify with J.S. The Department acknowledged father's criminal history and his failure

6

to show motivation to comply with court-ordered services until after the court terminated services in January 2013. But, the Department said father had recently shown a "tremendous" effort to reunify despite a limited support system, and therefore the Department recommended granting father's petition.

On August 1, 2013, the court heard father's section 388 petition. Father did not offer any live testimony, but relied solely on the petition. Father's counsel argued that father established both of the prongs required to obtain relief under section 388. Counsel said father, since termination of his reunification services in January 2013, had returned to therapy on his own initiative and had been in therapy since June 2013 seeking to address case issues, primarily parenting goals and skills. Father was paying for the counseling himself. Father had also consistently been visiting with J.S. and the visits were going well. Counsel argued it was in the best interests of J.S. to maintain a relationship with his biological father and have a chance to reunify.

Counsel for J.S. opposed the petition. Counsel argued J.S. had been in his current placement for over a year and a half and had developed a strong bond with his caregivers. Counsel conceded father's visits with J.S. went well but that father had claimed he would change before, and had failed to do so. Counsel said the record did not support that it would be in the best interests of J.S. to grant the petition.

The juvenile court denied father's petition, explaining: "The report just goes over what I knew from the first time the case came in. I gave the father a chance when the first petition was filed. And at that time I did not need to place with father, didn't need to go to that step, but he did make the same arguments to me that he had a football scholarship and blew it. He was going to change everything, going to be different. I'm just hearing the exact same thing now that I heard before[.] No, I don't believe it. [¶] It definitely would not be in the child's best interest, so I don't see that [father] changed. . . . Hopefully, with therapy he could change, but it would not be in the child's best interest to be moved after a year and a half with the same family regarding somebody else as his mother as he does."

7

The court proceeded with the permanency planning hearing. Mother's whereabouts remained unknown at the time. Counsel for mother asserted an objection on her behalf to the termination of her parental rights. Father contended the parent-child exception applied and therefore termination of his rights would be improper.

The court stated it had read and considered the reports and evidence. The court found clear and convincing evidence supported a finding J.S. was adoptable and terminated mother's and father's parental rights. The court found no exception applied and that it would be detrimental to J.S. to return him to the custody of his biological parents. The court ordered J.S. freed for adoption, found adoption to be the preferred permanent plan, and Mr. and Mrs. D. to be the prospective adoptive parents.

This appeal followed. On October 31, 2013, this court received a letter from counsel for the Department that it would not be opposing father's appeal relative to the section 388 petition since the Department had not opposed the petition in the juvenile court. This court subsequently granted a request for appointment of appellate counsel for the minor as the responding party to father's appeal.

On November 26, 2013, counsel for the Department sent another letter brief, supported by a declaration of counsel, stating the Department's position that it agreed ICWA notice was required based on counsel's review of the relevant case files which did not disclose any prior notices served, or responses received, in the earlier proceeding, nor any record the court made ICWA findings in that proceeding. The Department requested, in the event the court affirmed on the section 388 issue, a limited reversal and remand for the purpose of allowing the Department to properly effectuate ICWA notice.

## DISCUSSION

### 1.     The Section 388 Petition

Father contends the juvenile court erred in denying his section 388[2] petition.

---

[2]     Section 388, subdivision (a)(1) provides in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action . . . for a hearing to change, modify, or set aside any order of court

Resolution of a section 388 petition is committed to the sound discretion of the juvenile court, and a ruling will not be overturned on appeal "in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) " ' "The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

The gist of father's petition was that the section 366.26 hearing should have been delayed, and the court should have granted father renewed reunification services and liberalized visitation so that he could continue to forge a bond with J.S. and ultimately reunify with him. "For a parent 'to revive the reunification issue,' the parent must prove that circumstances have changed such that reunification is in the child's best interest." (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.) Once reunification services to a parent have been terminated, the parent's "interest in the care, custody and companionship of the child [is] no longer paramount." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; accord, *In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) Instead, the court's focus, given the stage of the proceedings, is on the dependent child's need for stability and permanency. (*Ibid.*; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

Here, father had been given reasonable time and appropriate services to maintain and strengthen his role as a parent. Following the filing of the initial petition, the court placed J.S. with father. Father nonetheless continued to engage in criminal behavior, precipitating the circumstances that brought about the filing of the current petition. Father was granted services, but failed to fully complete his case plan, and, as the Department conceded, did not appear to show any motivation to comply until *after* services were terminated in January 2013. The law is well established that "[t]he parent

---

previously made or to terminate the jurisdiction of the court. The petition shall be verified and . . . shall state the petitioner's relationship to or interest in the child . . . and shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction."

is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309; see also *In re D.R.*, *supra*, 193 Cal.App.4th at p. 1513 ["Once a case has advanced to the permanency planning stage, it is important not only to seek an appropriate permanent solution, but also to implement that solution promptly to minimize the time the child is in legal limbo."].)

The juvenile court did not abuse its discretion in finding it was not in J.S.'s best interest to delay the permanency planning hearing and reinstate reunification services to father for some indefinite period of time. J.S., just shy of his third birthday at the time of the hearing, had been in the care of Mr. and Mrs. D. for almost two years and was thriving in that placement. The caregivers wanted to adopt and had been approved to do so, with the exception of needing to complete supplemental paperwork supportive of the originally approved home study. The record shows father had started to make some commendable efforts to get his life on the right track since his release from prison. But, nothing in the record supports a finding the court abused its discretion in denying the petition.

### 2.    ICWA Notice

The notice requirements of ICWA serve the salient purpose of protecting Indian children and providing a mechanism for the maintenance of tribal and familial ties for those Indian children faced with the prospect of placement in the foster care system. (25 U.S.C. § 1901; see also *In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) The threshold of information necessary to trigger ICWA notice requirements is low. (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165 [ICWA triggered where mother denied heritage, but father claimed possible Cherokee tribal membership through paternal grandfather, with no biographical data other than grandfather's name].)

At the December 2, 2011 pretrial conference, the juvenile court found ICWA did not apply. We review the juvenile court's ruling for substantial evidence. (*In re J.T.* (2007) 154 Cal.App.4th 986, 991.) Substantial compliance with the notice provisions of

ICWA may be sufficient in certain circumstances. (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 566; accord, *In re I.G.* (2005) 133 Cal.App.4th 1246, 1252.)

There is nothing in the record here to determine whether notices were ever served, or whether any purported notices served in the earlier proceeding complied, substantially or otherwise, with ICWA. There were discussions on the record asserting notice had been previously given and that the BIA and the United Keetoowah Band of Cherokee Indians in Oklahoma had been served and responses showed J.S. was not an Indian child, but nothing is in the record showing those notices, what information was contained in them, proof of mailing or any of the responses. The Department submitted a letter brief, supported by a declaration of counsel, stating that a review of the earlier file did not reveal copies of any such notices or responses.

Paternal grandmother's identification of potential Cherokee heritage, even though it consisted of minimal family information, was sufficient to trigger ICWA notice requirements. (*In re Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165.) Requisite notices had to be served. (*In re Desiree F.*, *supra*, 83 Cal.App.4th at pp. 469-470 [the statute, as well as cases interpreting ICWA, "unequivocally require" actual notice to the tribe of both the proceedings and of the right to intervene].) Whether the Department served some form of notice in the earlier proceeding or not (of which there is apparently no documentation), proper notice must be effectuated here, as the Department concedes.

We therefore conditionally reverse the August 1, 2013 order terminating parental rights and remand for the limited purpose of allowing the Department to make and document reasonable inquiry regarding J.S.'s possible Indian heritage and to re-serve all requisite ICWA notices. In the event no timely response is received or responses indicate J.S. is not an Indian child within the meaning of ICWA, the juvenile court shall reinstate the order terminating parental rights. If responses are received raising a substantial question J.S. is an Indian child, the court shall hold further proceedings consistent with the statutory scheme.

**DISPOSITION**

The juvenile court's August 1, 2013 order denying father's section 388 petition is affirmed. We conditionally reverse the court's August 1, 2013 order terminating parental rights and remand with directions to the juvenile court to order the Department to make and document reasonable inquiry regarding possible Indian ancestry, and to re-serve all requisite ICWA notices. If, after receiving proper notice, no timely response is received or no tribe indicates J.S. is an Indian child within the meaning of ICWA, then the juvenile court shall reinstate its order terminating parental rights. If however, any response raises a substantial question the child is an Indian child, the juvenile court shall hold further proceedings consistent with the statutory scheme.

GRIMES, J.

We concur:

BIGELOW, P. J.

FLIER, J.

12