Filed 10/23/13  In re Cherish W. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re CHERISH W., a Person Coming Under the Juvenile Court Law. | C071878 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. No. JD232244) |
| Plaintiff and Respondent, | |
| v. | |
| Andrew W., | |
| Defendant and Appellant. | |

Andrew W., the father of four-year-old Cherish W.,[1] appeals from orders of the Sacramento County Juvenile Court denying his petition for modification of court orders

---

[1] In order to reduce confusion and improve readability, where the given names of the minor and her family members are among the 1,000 most popular birth names since the year 2000 according to statistical information gathered by the Social Security

1

(Welf. & Inst. Code, § 388)[2] and selecting a permanent plan living arrangement with the goal of adoption (§ 366.26, subd. (c)).[3] The father acknowledges his past substance abuse and failure to rehabilitate during the court-ordered reunification but argues that given evidence of his subsequent rehabilitation efforts and desire to reunite with the child, the trial court abused its discretion in denying his modification petition, which sought the reinstatement of reunification services.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Originating Circumstances*

The mother has a history of intravenous substance abuse and chronic homelessness. Both parents have criminal convictions for possession of controlled substances.

In late 2010 mother allowed Cherish and a sibling, William M., to reside first with maternal aunt Mariah M. in Shasta County, then with the maternal grandmother, and then with maternal aunt B.L. in San Luis Obispo County. This was done, in part, so mother could "serve some jail time."

In January 2011, on the advice of the Shasta County social service agency, B.L. initiated a San Luis Obispo County court proceeding seeking guardianship of the children. The proceeding was dismissed because the proper venue was Shasta County. Outside the courthouse, mother demanded that B.L. return the children to her care. Law

---

Administration (<http://www.ssa.gov/cgi-bin/babyname.cgi>), we will not designate them by initials but will use their first names and last initials. (*In re Branden O.* (2009) 174 Cal.App.4th 637, 639, fn. 2; *In re Edward S.* (2009) 173 Cal.App.4th 387, 392, fn. 1; Cal. Rules of Court, rule 8.400(b)(2).)

[2] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] Delaney M., the mother of Cherish, is not a party to this appeal.

enforcement responded and contacted child welfare services, and the children were placed in protective custody.  Father was homeless and his whereabouts were unknown.

### *Petition*

In February 2011 a petition was filed in San Luis Obispo County Juvenile Court alleging that Cherish and William came within section 300, subdivisions (b) and (g) in that they were at risk due to mother's substance abuse and transient lifestyle, and due to father's substance abuse, his failure to protect Cherish from mother, and his whereabouts being unknown.  Mother has a child welfare history including, at age 15, the removal and termination of parental rights to her infant son due to neglect and substance abuse.

### *Detention*

In February 2011 the San Luis Obispo County court detained the children, placing them with Bephen L. in that county.  Mother provided her address in Redding but asked that her mail be sent to an address in Bakersfield.  The next month, mother notified the court she had moved to Rainier, Oregon.

### *Jurisdiction and Disposition*

In April 2011 the San Luis Obispo County court sustained the section 300 petition, removed the children from parental custody, and ordered reunification services.

### *Six-Month Review*

The October 2011 six-month review report recommended that reunification services be terminated and a selection and implementation hearing be set.  According to the report, Cherish was living with B.L. in San Luis Obispo County, and father was living in Shasta County.  At the time, father was homeless, staying with various friends and seeking employment.  After Cherish was placed with her aunt, father visited once, in June 2011.  During the visit, Cherish "did not appear to recognize" father.  He "has stated his awareness that obtaining housing and a job are priorities in order for him to provide a stable home for Cherish."  However, at the time he had no housing or employment and was "unable to provide for [Cherish's] basic needs."

In October 2011 the children were relocated from B.L. in San Luis Obispo County to Mariah M. in Shasta County, due to the children's "very challenging behaviors" with B.L.

At the contested six-month review hearing in January 2012, the San Luis Obispo court terminated reunification services and calendared a selection and implementation hearing. In February 2012, at the request of the San Luis Obispo County Department of Social Services, the San Luis Obispo court transferred the case to Shasta County.

In late February 2012 the Shasta County Juvenile Court accepted the transfer from San Luis Obispo County. The court found that neither parent resided in Shasta County. Because mother was believed to be residing in Carmichael, the court ordered the case transferred to Sacramento County.

In March 2012 the Sacramento County Juvenile Court accepted the transfer from the Shasta court. According to the report for the transfer-in hearing, mother was residing in a Carmichael recovery home operated by her in-laws. Father was residing in Salem, Oregon. He acknowledged that his reunification services had been terminated, but he continued to attend substance abuse treatment and had completed parenting classes and anger management therapy. Mariah M. and her significant other were committed to adoption of the children. Neither of the previous counties had assisted her in obtaining services for the children's challenging behaviors.

The report stated that Cherish has "aggression towards peers, adults, and animals, and she hits, pushes, and bites others on a daily basis." Cherish has an eating disorder that, until recently, caused her to consume "excessive amounts of food until she vomited." The report noted that Cherish had reacted negatively following father's visit in January 2012. During the visit, she interacted more with the supervisor than with father, to whom she showed no attachment. Both children have significant behavioral outbursts for up to four days following visits or telephone contact with the parents.

4

*Section 388 Petition for Modification*

In June 2012 father filed a Judicial Council Forms, form JV-180 request to change court order (section 388 modification petition), requesting the juvenile court to vacate the hearing date for the selection and implementation hearing, reinstate his reunification services, and order the Sacramento County Department of Health and Human Services (Department) to initiate placement of Cherish with father in Oregon. The petition indicated that father and his wife were employed and resided in a two-bedroom apartment with a room prepared for Cherish. Since December 2011 father had completed substance abuse treatment services and had had 10 random drug tests, all with negative results. The petition included a June 1, 2012, letter from Dan Costello, a clinical alcohol and drug counselor at the Marion County Health Department (Oregon), stating that father had participated in six treatment groups and was "in the action stage of change at this time. His prognosis is good as long as he uses what he has learned in treatment services and continues to attend 12 step meetings as his support system." The petition claimed a recent visit between father and Cherish had gone well despite the long lapse in visitation.

In July 2012 the social worker filed a selection and implementation report noting that as of June 1, 2012, father did not have an Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) sponsor. The worker stated she "has assessed that the father's circumstances are changing. As he has only recently completed a drug treatment program, it is too early to determine whether or not the father can maintain his sobriety while continuing employment and parenting a newborn child." She opined it would not be in Cherish's best interest to grant the modification petition.

In August 2012 the social worker filed an addendum report stating she had spoken with Dan Costello, the author of the letter attached to the petition. The social worker "asked Mr. Costello if it would be a concern that the father reportedly has not obtained an

AA/NA sponsor [and Costello] stated that he would be a little concerned."[4]  Costello explained that "father obtained a job in the middle of treatment so he did not have a lot of time to search for a sponsor."  After acknowledging that "father's circumstances appear to have changed," the social worker "assessed it would not be in Cherish's best interest to grant his [section] 388 Motion.  The father did not engage in treatment until ten months after Cherish was placed into Protective Custody."  In the social worker's view, father's "progress has been completed too late to benefit Cherish."

The social worker concluded the children were not generally adoptable due to their behavioral and emotional challenges.  The worker opined that, at times, the children's special needs have overwhelmed Mariah M. and her significant other.  The family was receiving weekly in-home parenting therapy.  Due to an issue related to authorization of services and the caregivers' unavailability for appointments, there was a three-month lapse in services.  The therapist indicated that once the caregivers were assessed as being able to provide stability and consistency for the children, the caregivers could begin addressing the children's needs in individual therapy.

At the hearing in August 2012 the social worker acknowledged that father had completed parenting education and components of his substance abuse treatment and that he had attended a mentor group.  However, she was concerned that he did not have an NA sponsor.  She acknowledged he had adequate housing, as confirmed by Oregon authorities.

In summary, father testified as follows:

There were no jobs in Shasta County.  He moved to Oregon in October 2011 and married on March 14, 2012.  He started his services in Oregon in December 2011

---

**4**  At the hearing, the social worker acknowledged that Costello had told her the lack of an AA/NA sponsor "would be a slight concern for him."  The Department's briefing mistakenly attributes this statement to father, not Costello.

pursuant to the case plan from San Luis Obispo County. He completed 20 parenting classes, which he found useful. He attended substance abuse treatment that included relapse prevention, family, and parenting components. The treatment helped him understand addictive thinking and the desire for instant gratification. The parenting aspect taught skills for handling children who are throwing fits or having outbursts. As part of his substance abuse treatment, father attended NA meetings two days per week on his days off. He was looking for a sponsor who had worked the 12 steps, had been clean and sober for more than a year, and shared his own "religious preference" or "higher power." Due to the new baby and demands of his job, he had not gotten to know anyone well enough to request sponsorship. His drug of choice was marijuana and his last positive test had been in November 2011. Since Cherish's birth, he had used marijuana seven or eight times. He opined that he did not want to raise children in Shasta County.

A bedroom at his apartment was available for Cherish and equipped with a toddler bed, dresser, and television. The Oregon social worker had seen the room.

He allowed the maternal relatives to take Cherish to San Luis Obispo County for B.L.'s birthday party. Father visited Cherish in San Luis Obispo several times before the case was transferred to Shasta County. After he moved to Oregon in October 2011 and the case was in transition between counties, he missed visits with Cherish.

He had not observed Cherish's aggressive behaviors during his visits. He and his wife were willing to work on the behaviors with an in-home therapist.

He had not discussed Cherish's behavior with Mariah M. because she was not present during visitation and did not answer his telephone calls. Father located a day care facility for special needs children that was willing to accept Cherish.

Father's wife, Crystal W., testified that Cherish was welcome in the home. She confirmed her employment with a debt collection company. She had medical and dental insurance, and Cherish was eligible to be added on to the policy. She confirmed locating day care for Cherish and her own newborn.

7

### *Court Ruling*

The juvenile court ruled that father had successfully established his "circumstances are changing." Thus, father recognized he had "a substance abuse problem" and was "taking steps to deal with" his substance abuse problem. The court commended him for where he was at that point in his life: "This is where we need to see [father] going." But the court stated it had to "consider as well the length of the problem versus the relatively new efforts and very short period of time over which" father had maintained sobriety. After acknowledging that father had "learned a lot of good things in" his substance abuse program and had "made some very positive steps," the court opined it had "heard a lot of excuses as to why he had no sponsor. Those were all excuses. There is no legitimate reason." The court explained: "I think selecting a sponsor is an important decision, and it shouldn't be like you pick the first person that walks by and you're going to be my sponsor. I know that's not appropriate. But [father] is now attempting to maintain sobriety, having completed this program, and there is not an indication that he is making his sobriety the same priority in his lifetime. That is something that needs to happen."

The court stated it was "very, very troubled by the testimony that [father] only used marijuana seven or eight times since Cherish was born, because what seems to be very clear from reading this file is that for the first year that Cherish was a dependent of the juvenile court, [father] was largely absent. [¶] And for the Court to accept that he used marijuana seven or eight times over the course of that one-year period, one of two things is the truth. Either he's telling me the truth and he only used marijuana seven or eight times, then there are issues we have not even begun to address about [father's] ability to be a consistent and reliable parent to his child because he doesn't have an excuse that I was so far into my drug addiction that nothing else mattered. He just abandoned his child. I don't think that's what happened. I think he was much more involved in his addiction than he would like the Court to believe. But if that's the case,

8

then I have to question how far really has he come in terms of his treatment if there's not any acknowledgment of that."

The court next found that father had not participated in a mental health assessment and had not demonstrated that he had the ability to meet the needs of Cherish. But the court acknowledged that the parenting classes "certainly are a good starting point."

The court noted that it was "required to look at the best interest of [Cherish] as well. And that's really where [father] fail[s] heavily on [his] modification petition[]. There were a lot of if arguments by all counsel, if the caretaker, if her depression gets worse and she has a breakdown, then we need to move [Cherish]. If that happens, we will deal with it appropriately."

The court stated it "can't disregard" the evidence that Cherish's "behaviors regress after [she has] visits with [her] parents. And that may be a result of the early parenting of [Cherish]. That may be, in part, related to the lack of consistent visitation contact that [Cherish has] had. But [Cherish does not] get punished or penalized even if the Department hasn't had the visitation occur as regularly as it should."

The court stated that Cherish's "behavior at the age of two is described as not only being violent as it is, but she is becoming aggressive towards animals which is quite consistent in terms of her mental health and emotional well-being. So [she is a] very disturbed young child[] at [a] very young age[]. And [she] need[s] a place where [she] can be stable. So I don't think that [father has] met [his] burden either to show that [he has] changed [his] circumstances, such that [he] could appropriately care for [Cherish] or that it is consistent with the best interest of [Cherish]. And the Court is therefore denying the modification request[]."

## DISCUSSION

Father contends the juvenile court abused its discretion when it denied his modification petition. Specifically, father claims he showed by a preponderance of

9

evidence that returning Cherish to him, or resuming his reunification services, served Cherish's best interests. We disagree.

## A.

### *Section 388 Petition*

Section 388 provides in relevant part: "Any parent . . . may, upon grounds of change of circumstance . . . , petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made." (§ 388, subd. (a)(1).)

"The parent requesting the change of order has the burden of establishing that the change is justified. [Citation.] The standard of proof is a preponderance of the evidence. [Citation.]" (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703 (*Michael B.*).) The best interests of the child are of paramount consideration when the petition is brought after termination of reunification services. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid.; In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) The court considers "the seriousness of the problem leading to the dependency and the reason for its continuation; the strength of the parent-child and child-caretaker bonds and the time the child has been in the system; and the nature of the change of circumstance, the ease by which it could be achieved, and the reason it did not occur sooner." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685 (*Amber M.*), citing *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.) "For a parent 'to revive the reunification issue,' the parent must prove that circumstances have changed such that reunification is in the child's best interest. [Citation.]" (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.]" (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

10

## B.

### *Standard of Review*

Determination of a petition to modify is committed to the sound discretion of the juvenile court, and absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) Rarely does the denial of a section 388 petition merit reversal as an abuse of discretion. (*Amber M.*, *supra*, 103 Cal.App.4th at pp. 685-686.)

## C.

### *Analysis*[5]

Father claims he established, by a preponderance of evidence, that returning Cherish to his care or reinstating his reunification services was in her best interest. Applying the three-part analysis set forth in *Amber M.*, *supra*, 103 Cal.App.4th at page 685, father acknowledges that the "reasons for this dependency were quite serious," and that "professional assessment of the relationships" between Cherish and father, and between Cherish and her caretakers, is "absent from the record." But father claims the remaining factor, the degree to which the cause of the dependency has been removed, favors his argument.

Specifically, father argues the juvenile court's conclusion that he "established changing rather than changed circumstances was wrong." Father claims the reasons for

---

[5] Father argues his move from California to Oregon was necessary to his rehabilitation, and his rehabilitation thus became at odds with his establishment or maintenance of a meaningful parent-child relationship. He also argues the transfers of placement between maternal relatives, and the ensuing changes of courts and social workers, interfered with his visitation. The Department claims father thus "argues by implication" that "he might not be able to assert" the "beneficial parental relationship" exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) "at some future time." We have no occasion to consider that issue in this case.

Cherish's removal had been ameliorated by his employment; his housing, approved by the Oregon authorities; his marriage; his good care of his newborn child; and his "extensive and successful" drug rehabilitation. Father notes that after assessing in July 2012 that "father's circumstances are changing," the social worker filed an addendum the next month acknowledging that "father's circumstances appear to have changed."

But the juvenile court could conclude, at least with respect to drug rehabilitation, that father's circumstances were merely changing. The June 1, 2012, letter from alcohol and drug counselor Dan Costello, which father appended to his section 388 petition, plainly stated that father was "in the action stage of change at this time. His prognosis is good as long as he uses what he has learned in treatment services and continues to attend 12 step meetings as his support system."

Father does not contend the phrase "action stage of change" refers to change that has already occurred, as opposed to change that is ongoing. The social worker did not suggest, and father does not contend, this "action stage of change" concluded any time prior to the addendum report or, indeed, prior to the hearing. Because the evidence of changed circumstances was in conflict, the juvenile court was entitled to conclude, consistent with father's own evidence, that the circumstances of his rehabilitation were merely changing. Father's progress on the remaining items did not compel a finding that the circumstances of his rehabilitation had changed.

Father's reliance on the juvenile court's remark that he had "no legitimate reason" to not have an NA sponsor is misplaced. Father claims the court erred when it engaged in "personal speculation" and drew "unreasonable inferences relating to beliefs about the value of a sponsor over the value of a mentor the father had through his drug counselor."

As noted, the parent requesting the change of a dependency court order has the burden of establishing that the change is justified. (*Michael B.*, *supra*, 8 Cal.App.4th at p. 1703.) At the hearing, father questioned the social worker about the functions of an

12

AA or NA sponsor, but the Department successfully objected on foundational grounds to father's question whether his mentor or mentor group was similar to an NA sponsor. Because father did not establish that a mentor and sponsor are sufficiently similar, the court's evident belief that a mentor is not an adequate substitute for a sponsor was not contradicted by the evidence.

Contrary to father's argument, the juvenile court could fairly infer from his testimony at the hearing that either his drug addiction was more severe than he acknowledged, or there were unexplored issues as to why he had "just abandoned his child." No error is shown.

Father's reliance on *In re Aaliyah R.* (2006) 136 Cal.App.4th 437 is misplaced. In that case, the mother tried to show changed circumstances based upon her " 'positive' " behavioral changes such as waking up and going to school, waking up and giving her child a nutritious meal, and being on time for school two days in a row. (*Id*. at p. 448, fn. 7.) The appellate court did not suggest these behavioral changes came anywhere close to the showing required on a section 388 motion. (*Aaliyah R.*, at p. 448.) The fact that father's changes are more substantial than those in *Aaliyah R.* does not mean he is entitled to reversal of the judgment.

Because father has not shown that his circumstances have changed, it is not necessary to consider whether his proposed change of order would serve the best interests of Cherish. His section 388 motion was properly denied.

## DISPOSITION

The order is affirmed.

                                                    RAYE          , P. J.

We concur:

          BUTZ          , J.

          DUARTE        , J.

13