Filed 6/30/14  In re D.R. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B253866 (Super. Ct. No. J068807) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.G.,<br><br>    Defendant and Appellant. | |

J.G. (mother) appeals from orders terminating her parental rights to her son, D.R., selecting adoption as the permanent plan and summarily denying her petition under Welfare and Institutions Code section 388[1] to modify a previous order terminating reunification services.  (§ 366.26.)  She contends the juvenile court committed reversible error by declining to conduct a full evidentiary hearing on her section 388 petition.  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

FACTS AND PROCEDURAL BACKGROUND

Mother has three children. Her oldest child was removed from her custody in 2009. In April 2012, D.R., who was then 5, and his younger half-brother were detained as a result of mother's history of substance abuse, her failure to provide them with regular and necessary care and their subjection to an unsafe, unsanitary and drug-laden living environment. The juvenile court sustained the dependency petition as to both children (§ 300), and ordered reunification services as outlined in the case plan. Only D.R.'s case is at issue here.

Mother has a number of health issues, including a history of substance abuse, weight issues, food addiction, dental problems, thyroid dysfunction, sleep apnea and mood and anxiety disorders. She has criminal convictions for petty theft, failure to have her child attend school, possession of a controlled substance, being under the influence of a controlled substance and possession of a smoking device. Between 2004 and 2010, mother was reported to respondent, Ventura County Human Services Agency ("HSA"), for drug use, for housing her children in a filthy environment and for failing to care for them.

D.R.'s father died in December 2011. When the children were detained, mother, who was on probation, was living with her boyfriend in an apartment known for high-traffic drug activity. Witnesses saw about two dozen people going in and out of the apartment daily, and police attributed at least 10 drug-related arrests to mother or the apartment. During a search, officers discovered hashish brownies, methamphetamine and hypodermic needles, all within reach of the children. Others in the apartment were found to be under the influence of a controlled substance.

Mother's apartment presented a number of other dangerous conditions. Clothes, trash and other items were stacked so high that they could topple over and fall on the children. Electrical outlets were exposed, and there was no running water in the kitchen. The apartment had no fire alarm, and because the windows were barred, it had no emergency exit.

D.R. displayed typical signs of neglect. Physically, he had nine cavities, five of which required nerve treatment and IV sedation. Cognitively, he had learning and developmental delays. Emotionally, he was "detached from his feelings" and unwilling to discuss his home life. He also exhibited strange behaviors, such as falling on the ground and saying, "I'm drunk."

During supervised visits, mother would talk on her cellular telephone while D.R. played alone. Staff at Casa Pacifica Shelter did not observe a close bond between them. D.R. did not cry or ask for his mother, and did not get excited when relatives came to visit him. A month after his detainment, a social worker noted that D.R. "seems to be uninterested and not attached to his mother or any caregiver."

In July 2012, a social worker observed mother engaging D.R. in inappropriate conversations about the case, including discussing reunification in violation of court orders, admonishing him for calling his foster mother "step mom" and telling him that he was making her cry. A few months later, mother said she was "not ready" for unsupervised visits and did not "want [the children] here right now" because she "need[ed] to get the house ready first." Mother also missed several visits with D.R. and at one point said she would prefer to focus on reunification with his younger sibling.

As visitation with mother increased, D.R. began acting out, defecating and urinating in his bedroom at his then foster home. He had difficulty sleeping the night before scheduled visits and was anxious in car rides to and from the visits. On one occasion he tried to avoid a visit by asking his foster mother to lie and say he was sick.

When mother and D.R. did engage in unsupervised visits, D.R. reported that she read him court papers, accused him of causing his own detention and told him to lie about what they did during their visits. Mother gave D.R. unhealthy food and drove him around even though she did not have a driver's license. After one visit, D.R. started crying and said, "my mother left me somewhere with a lot of rooms." He also said she "was yelling at the park . . . I told her to stop."

Mother had difficulty accepting responsibility for the issues causing the children's detainment. Initially, she blamed the landlord for placing bars on the

apartment windows. Later, she blamed the police. She said, "I get harassed just because I was on probation. I can't help that I don't make enough money and have to live where I do." Regarding the drugs found in her home, mother said the drug users were all upstairs and "[i]t's not my fault that the owner rents to drug users." She then started blaming D.R. Regarding his detainment, D.R. told his foster mother that "it's my fault." He said, "My Mom is poor. She gets no money if l don't live with her."

After participating in reunification services for over a year, mother continued to make inappropriate comments to D.R. She cried in front of her children, and during one visit, she told D.R. he was her "bad boy." A social worker cautioned mother not to make negative comments to D.R., but mother again told D.R. he was "bad." During another visit, when D.R. asked mother why she was wearing glasses, she responded, "I am going blind because you don't live with me." She told him she had to pay over $1,000 in rent even though he was not living with her.

D.R.'s paternal grandparents believe he has blossomed in his current foster family's care. D.R.'s court-appointed advocate observed that "[s]ince being placed in his current foster home he has truly become a child. When I met him in August of 2012 he was guarded and in survival mode. Now he feels safe, cared for, loved and part of a wonderful family. He is sleeping soundly and has let go of his worries." D.R. told his therapist that he wants to stay with his foster family forever and does not want to live with his mother. He said, "[I]f I live [with] my mom then I'll feel sad because she probably will do drugs and yell at me again."

The dependency court held a six-month review hearing in December 2012. The court found that mother had partially complied with the case plan but that her progress was only moderate. At the 12-month review hearing, the court found that mother had not demonstrated a benefit in services, had only recently begun participating in mental health services and continued to be inappropriate in visits with D.R. It found "[t]he extent of progress made by the mother . . . toward alleviating or mitigating the causes necessitating placement has been minimal." On August 9, 2013, the court terminated reunification services to mother and ordered adoption as the permanent plan.

4

On January 7, 2014, mother petitioned for a change of court order pursuant to section 388. The juvenile court summarily denied the petition, rejecting mother's request for an evidentiary hearing. It found by a preponderance of the evidence that mother had failed to make a prima facie showing of changed circumstances or that continued reunification services would be in D.R.'s best interests. The court terminated mother's parental rights and set adoption as the permanent plan. (§ 366.26.) This appeal followed.

DISCUSSION

Mother contends the juvenile court abused its discretion by summarily denying her section 388 petition seeking modification of the order terminating reunification services. We disagree.

"The parent [seeking modification must] make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1412-1414.) "There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. [Citation.] We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.)

To demonstrate changed circumstances, mother presented the following: (1) a report indicating she had completed in-home parenting services through July 29, 2013; (2) certificates of achievement for parenting courses dated November 2012 and April 2013; (3) a six-month drug treatment program certificate dated September 20, 2013; (4) a letter stating she and her boyfriend had attended couples counseling between

5

August 2013 and November 2013; and (5) letters stating she attended four individual counseling sessions from August 2013 to October 2013.

The first two categories of documents do not constitute new evidence or changed circumstances because they existed when the juvenile court terminated services on August 9, 2013. (*In re H.S.* (2010) 188 Cal.App.4th 103, 108-109 [evidence of changed circumstances must not have existed at time of termination].) The drug treatment program certificate also is not a changed circumstance because most of the program was completed prior to the August 9 order. (*Ibid.*)

The only "new" information was evidence of couples counseling between August and November 4, 2013, and four individual counseling sessions between August and October 2013. Mother provided no evidence of efforts to address her problems between November 4, 2013, and January 7, 2014, the date the petition was filed. Moreover, mere continuation of therapy is not a sufficient showing of changed circumstances for modification of an order under section 388. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610; *In re A.S.* (2009) 180 Cal.App.4th 351, 358 [completion of parenting class and participation in individual counseling insufficient to require evidentiary hearing on section 388 petition]; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 641-642 [participation in 12-step meetings insufficient evidence of changed circumstances to justify a hearing because father already received extensive alcoholism treatment with no improvement].)

Even if mother had demonstrated changed circumstances, she did not make a prima facie showing that granting her further services would serve D.R's best interests. Once reunification services are terminated, the juvenile court's focus shifts from reunification to the child's need for permanency and stability. (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512-1513 ["[T]he disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion"].) When D.R. was detained, he was physically, cognitively and emotionally scarred. Since being placed with his current foster family, D.R. has

6

blossomed as a child and wants to stay with them forever.  The family is committed to adopting him and providing him with permanency and stability.  As the juvenile court observed, halting the adoption process and allowing mother additional reunification services would disrupt this placement.  (See *In re Jackson W.* (2010) 184 Cal.App.4th 247, 260 ["The petition made no showing of how the minors' best interests would be served by depriving them of a permanent, stable home in exchange for an uncertain future"].)

Finally, mother asserts that, where credibility is at issue, the denial of an evidentiary hearing on a section 388 petition constitutes a violation of due process.  (See *in re Clifton V.* (2001) 93 Cal.App.4th 1400, 1405.)  Her petition alleges she has "a close relationship" with D.R. and "believe[s] . . . he wants to be returned to [her]."  Mother claims that because these allegations contradict statements in the social workers' reports, the juvenile court must hold a hearing to assess the credibility of those statements. Nothing in the record suggests, however, that the juvenile court denied the petition because it questioned the credibility of mother's allegations.  Absent express indications to the contrary, we must assume the court considered whether mother's allegations, taken as true, established a prima facie showing that reinstatement of services was justified by changed circumstances and would be in the child's best interests.  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [error not presumed but must be affirmatively shown].)

In sum, mother's factual allegations and evidence failed to establish a prima facie case of changed circumstances or that the proposed modification would be in D.R.'s best interests.  The juvenile court acted within its discretion in summarily denying the petition.

## DISPOSITION

The orders terminating parental rights, selecting adoption as a permanent

plan and denying the section 388 petition are affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

8

Bruce A. Young, Judge

Superior Court County of Ventura

_____


Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Leroy Smith, County Counsel, Ronda J. McKaig, Assistant County Counsel, for Plaintiff and Respondent.