Filed 4/19/21  In re E.A. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.A. et al., Persons Coming Under the Juvenile Court Law. | B307114 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. Nos. 17CCJP00273B, 17CCJP00273C, 17CCJP00273D) |
| Plaintiff and Respondent, | |
| v. | |
| M.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant M.G.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

M.G. (mother) appeals from orders of the juvenile court denying her petition filed pursuant to Welfare and Institutions Code section 388.[1] We affirm the juvenile court orders.

### FACTUAL AND PROCEDURAL BACKGROUND

These dependency proceedings began in September 2017, when then one-year-old J.R. ingested methamphetamine and was hospitalized. Mother had left J.R. and his twin brother, A.R., overnight in the care of her roommate. She left the twins' then three-year-old sister, E.A., with a neighbor.[2] When mother returned home the next morning, she noticed J.R. was shaking. He appeared to be having a seizure. Mother took J.R. to the emergency room and learned he had ingested methamphetamine. A police officer investigating the incident found a drug pipe on the couch in mother's home.

Mother knew that her roommate smoked methamphetamine and had a history of using drugs. Mother also admitted that two weeks earlier she left J.R. and A.R. with the same roommate and A.R. had fallen off a bed. However, she claimed the roommate did not use drugs around the children. Mother initially denied that she used drugs, but later admitted she snorted methamphetamine, smoked marijuana, and drank

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Mother's oldest child, G.A., was in the care of her father. G.A. is not a subject of these proceedings.

alcohol every week.  She also admitted recently using methamphetamine when out with her roommate.  She denied ever using drugs at home or in the presence of the children.

The Los Angeles County Department of Children and Family Services (DCFS) detained the children and filed a petition seeking dependency jurisdiction under section 300, subdivision (b).  In interviews for the detention and jurisdiction and disposition reports, mother told DCFS social workers that when she was a minor, her own mother used drugs and drank alcohol.  Mother spent time in foster care because of her mother's drug addiction.  Mother began using cocaine, alcohol, and marijuana at age 14; she began using methamphetamine at 21.[3]  Mother admitted suffering from anxiety and depression.  She was not receiving any mental health treatment.  Although the children were generally in good health, neither twin was walking or speaking.  A foster parent noted A.R. appeared to be suffering from significant developmental delays.

In January 2018, mother entered a plea of no contest.  The juvenile court sustained allegations that mother's substance abuse, her actions in allowing the roommate to have unlimited access to the children, and her inadequate supervision and care all placed the children at substantial risk of suffering serious physical harm or illness.  In March 2018, the juvenile court asserted dependency jurisdiction over the children and removed them from mother.[4]  The court ordered DCFS to provide mother

---

[3] Mother was 26 years old when these proceedings began.  She said she stopped using drugs each time she became pregnant.

[4] The court found M.R. to be the children's alleged father.  Throughout the proceedings, M.R. resided out of the country and

with family reunification services.  Mother was to participate in random or on demand drug and alcohol testing, a full drug and alcohol program with aftercare, a 12-step program, parenting classes, and individual counseling.  The written case plan indicated a missed or diluted drug test would be presumed to be a positive test.  The court further ordered that mother's individual counseling must address "all underlying [issues] contributing to mother's drug/alcohol abuse" and "the detrimental impact that mother's drug abuse has upon her ability to appropriately parent and attend to her children's special needs."  The individual counseling was to be with a licensed therapist, or under the supervision of a licensed therapist.  Mother was awarded monitored visits with the children, at a minimum of two visits per week.

Mother was discharged from two substance abuse programs.  At the end of February 2018, and again in March 2018, mother relapsed.  Although mother's substance abuse counselor recommended that she participate in an inpatient program, mother refused and instead enrolled in a third outpatient program in April 2018.  In July 2018, mother tested positive for methamphetamine.  In January 2019, mother completed the substance abuse program.

Mother participated in individual counseling, however her first therapist informed a DCFS social worker that her agency would not accept documentation regarding the case and the agency "did not follow [c]ourt orders."  The therapist also told the social worker that she would not be able to provide information

did not make an appearance in the case.  M.R. is not a party to this appeal.

about mother's progress beyond her dates of attendance. Although the therapist later provided the social worker with information about mother's progress, mother stopped receiving therapy in December 2018. She began again in February 2019. DCFS had difficulty obtaining information about mother's psychiatric care. In late 2018, DCFS verified that a psychiatrist had prescribed medication for mother, but in February 2019, the psychiatrist's office informed a social worker that mother had not met with the psychiatrist since late November 2018.

Throughout the proceedings, DCFS reported there were problems with mother's visits. In May 2018, the caregiver told DCFS mother was inconsistent and left visits early. Mother argued with the caregiver and brought other individuals to the visits, which was "distracting and cause[d] issues during the visits." In September 2018, DCFS reported mother canceled several visits and was usually late to the visits she did attend.

In the months that followed, mother continued to bring other individuals to the visits. At a visit in February 2019, mother brought a male friend to the caregiver's home. E.A. later told the caregiver that at a party two years earlier, this male friend took off his clothes, threw up, and "pooped inside the jumper at the party." E.A. also told the caregiver that the same male friend tried to remove her clothes and told her to go in the jumper and "shake her 'booty.' "

E.A. subsequently told a DCFS social worker more of her recollections about mother's friend. E.A. recalled that she once woke up and found mother and the friend next to her, in her bed, "moving up and down very fast." When E.A. asked them to stop, mother slapped her. Mother and the friend continued, keeping E.A. awake. E.A. also told the caregiver she saw a man touch

mother while both were naked. E.A. discussed mother's many boyfriends, and remarked on seeing mother arriving at a visit with a "different boyfriend." E.A. began receiving mental health services to help her manage the negative feelings associated with these past experiences. The caregiver also received guidance from a mental health liaison to help E.A. cope with her disturbing memories.

In March 2019, DCFS reported that mother continued to change the days of visitation and still brought strangers to her visits. Mother's visits remained monitored. Mother admitted a male friend transported her to visits but denied the children had any contact with him. When asked about E.A.'s reports of seeing the friend at mother's visits, "mother appeared oblivious and did not show any empathy on how this male friend has impacted the child's life." Mother could not explain why E.A. would say the friend had tried to remove her clothes, but mother also did not seem surprised, angry, or concerned about the disclosure. She claimed the caregiver was lying and "putting things in [E.A.'s] head that would make mother look bad." Yet, the social worker saw a video on mother's Facebook page from February 2019 clearly showing mother's friend was present at one of mother's visits with the children that month.

In April 2019, mother filed a petition seeking a change of court order pursuant to section 388. Mother asked for unmonitored visits, arguing no one could care for her children or love them as she could. She attached a number of documents to the petition, including certificates showing her completion of a substance abuse program, parenting classes, and stress and anger management classes; character references; and 12-step program attendance certificates and logs. She also attached

documents showing her participation in mental health services through the end of 2018, and two 2019 appointments.

In a subsequent last minute information, DCFS expressed concern about E.A.'s disclosures, the presence of mother's male friend at her visits, and mother's denials and lack of concern about what E.A. had disclosed. DCFS further reported that although mother indicated she was seeing a specific psychiatrist, the social worker's further investigation revealed the individual mother named was a therapist rather than a psychiatrist. DCFS additionally reported mother showed a lack of interest and interaction with J.R. and A.R. According to the report, mother demonstrated little bonding with the twins, despite both the caregiver's and the social worker's efforts to encourage mother to spend more time with the twins, instead of excluding them while focusing on E.A. Mother had only recently begun to show greater interest in J.R. and A.R. An additional last minute information provided details of mother's psychiatric treatment. The report noted mother had only recently started seeing a psychiatrist. DCFS again expressed concerns about mother's lack of consistent mental health treatment.

At the 18-month review hearing in May 2019, counsel for DCFS argued that although mother had received over 20 months of services, and although she had participated in programs and testified in a manner that seemed genuine, her actual progress was minimal.[5] Counsel argued the cross-examination of mother

---

[5] Although the 18-month review hearing was originally set for March 26, 2019, it was continued several times and did not proceed until May 9, 2019. Mother and the social worker testified on that date and the matter was continued to May 14,

revealed she twice left substance abuse programs; she had continued in individual therapy that was insufficient given the agency's unwillingness to cooperate with DCFS or the court; mother repeatedly switched psychiatrists; and, despite participating in a 12-step program for nearly two years, mother was still only on the program's first step. Counsel pointed to mother's dismissive response to E.A.'s disclosures and her lack of concern as evidence that mother was not ready for unmonitored visits. Counsel further asserted the court could not trust mother to stay away from the people she associated with when she was using drugs.

The children's counsel similarly argued that mother continued to be seen with the male friend who was also around when the family first came to the attention of DCFS, when mother was still using drugs and J.R. ingested methamphetamine. The children's counsel asserted mother continued to deny responsibility for what happened to J.R.

Mother's counsel pointed to mother's completion of programs and participation in services as evidence that she had, in fact, made significant progress. Mother's counsel argued there was no risk to the children in being returned to mother's care with continued supervision.

The juvenile court acknowledged mother had participated in programs, yet noted that in her testimony she took no responsibility for J.R. ingesting methamphetamine at the outset of the case. The court expressed concern that after more than a year, mother was still on the first step in her 12-step program,

---

2019, for argument and the court's ruling. The record on appeal does not include a transcript of the May 9, 2019 proceedings.

8

and the court did not believe mother was taking the program seriously. The court further noted that while mother had addressed her drug use, she had missed many tests in the prior five or six months and her associations and lifestyle created concerns about her ongoing sobriety. In its ruling, the court stated it was considering the special needs of J.R. and A.R., and the trauma E.A. had suffered, as reflected by her disclosures about her interactions with mother's friend. The court terminated mother's reunification services and set a hearing pursuant to section 366.26 (.26 hearing). The court further denied mother's 388 petition, finding it did not state new evidence or a change of circumstances, and the proposed change of order did not promote the best interests of the children.

In a September 2019 report for the .26 hearing, DCFS informed the court the children had lived with their caregiver—a non-related extended family member—for around 18 months. The caregiver was meeting all of the children's needs and included them in her family. The caregiver and children were mutually affectionate. The bond between them was apparent.

In September 2019, mother filed another 388 petition, requesting her "parental rights back." She stated she was in compliance with her case plan and had completed programs as ordered. Mother further argued it was in the children's best interest to be returned to her because she was their mother, she could care for them unconditionally, the children told her they loved her, and she had been consistently visiting. Mother attached the documents she had submitted with the prior 388 petition. The juvenile court denied the petition, again finding the request did not state new evidence or a change of circumstances, and the requested change would not promote the children's best

9

interests.  The court noted the documents attached to the petition were the same as those previously submitted and considered at the 18-month review hearing.

A November 2019 status review report continued to note mother's inconsistent visits, although DCFS acknowledged that most of the cancelled visits occurred because the children or mother were sick.  Still, the report noted mother frequently made false promises to the children and called the caregiver at odd times of the day.  E.A. informed the social worker that mother had instructed her to tell the social worker that she loved mother and wanted to live with her.  When the social worker asked E.A. how she felt about this, E.A. responded that she loved the caregiver because the caregiver was nice to her.  The caregiver told DCFS she was attached to the children, wanted to provide a safe and stable home for them, and wished to adopt.

In advance of a continued .26 hearing in May 2020, a social worker reported the children were affectionate and loving towards the caregiver.  The twins looked to the caregiver for attention and support when playing.  They hugged her and stayed close to her, trusting her for safety and care.  E.A. told the social worker she loved her "mommy," referring to the caregiver.

In July 2020, mother filed another 388 petition seeking return of the children, additional family reunification services, or an order vacating the .26 hearing and granting mother unmonitored visits.  The petition asserted the requested change in court orders would benefit the children because they were bonded with mother and she could provide a safe and loving home for them.  In addition to certificates submitted with prior 388 petitions, mother attached documents showing her participation in therapy and psychiatric services in March, April,

10

and May 2020.  A letter indicated mother enrolled in further outpatient drug and alcohol treatment in September 2019, and she completed the program in April 2020.  She also submitted a log showing 12-step meeting attendance in 2020.

A July 30, 2020 last minute information reported mother had not participated in random drug testing through the DCFS-approved testing facility in the prior six months.  DCFS noted that mother's 388 petition and the attached documents did not address the concerns of E.A.'s disclosures about mother's male friend, mother's continued association with that individual as evidenced by her bringing him to visits, mother's dishonesty about the male friend's presence at visits, and mother's decision to instead insist E.A. and the caregiver were lying.  The report again noted the children were "very stabilized, closely bonded and emotionally secure in their pre-adoptive home with the caregiver," and opined it would not be in the children's best interests to "disrupt their lives again."

At the July 30, 2020 hearing, the juvenile court summarily denied the 388 petition.  The court then proceeded to the .26 hearing and terminated parental rights.  Mother's appeal timely followed.

## DISCUSSION

### I.     The Trial Court Did Not Abuse Its Discretion in Denying Mother's 388 Petition

Mother's sole argument on appeal is that the juvenile court abused its discretion in denying her 388 petition without an evidentiary hearing.  We find no error.

#### A.     *Applicable Legal Principles*

"Section 388 provides for modification of juvenile court orders when the moving party presents new evidence or a change

of circumstances and demonstrates modification of the previous order is in the child's best interests.  [Citations.]  To obtain a hearing on a section 388 petition, the parent must make a prima facie showing as to both elements.  [Citations.]  [¶]  The petition should be liberally construed in favor of granting a hearing, but '[t]he prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.'  [Citations.]  The petition may not consist of 'general, conclusory allegations.'  [Citation.]  'Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at [the] hearing . . . .'  [Citation.]  When determining whether the petition makes the necessary showing, 'the court may consider the entire factual and procedural history of the case.' "  (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 6–7.)

After the juvenile court has terminated family reunification services, family reunification is no longer the primary goal of the proceedings.  Instead, " 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  [Citation.]  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child."  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re K.L.* (2016) 248 Cal.App.4th 52, 62.)

We review a juvenile court order summarily denying a 388 petition for abuse of discretion.  (*In re Samuel A.*, *supra*, 55 Cal.App.5th at p. 7; *In re K.L.*, *supra*, 248 Cal.App.4th at p. 62.)  " ' "The appropriate test for abuse of discretion is whether

the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

### B.    *Discussion*

Mother has not established the juvenile court's summary denial of her 388 petition exceeded the bounds of reason.  By the time mother filed her last 388 petition, evidence had previously been submitted to the court establishing that mother had completed a substance abuse program, that she had at least intermittently participated in mental health services, and that she regularly attended 12-step meetings.  The documentation submitted in connection with the last 388 petition showed, at most, continued participation in services.  It did not address, for example, mother's failure to regularly drug test.

However, even if mother's petition sufficiently alleged new evidence or changed circumstances, we find no abuse of discretion in the juvenile court's conclusion that mother did not establish a prima facie case that the requested orders would be in the children's best interests.  As noted above, once the juvenile court terminates reunification services, the focus of the proceedings changes from family reunification to the needs of the children for permanence and stability.  (*In re J.H.* (2007) 158 Cal.App.4th 174, 182–183 [children need stability and permanency, not protracted legal proceedings that prolong uncertainty for them].)  Mother's 388 petition asked the court to return the children to her, grant her further reunification services, or vacate the hearing to select a permanent plan.  The petition asserted only that the children were bonded with mother and she could provide

13

a safe and loving home for them. These were conclusory statements that were in conflict with the record before the juvenile court. Although the children were detained over two years earlier, mother still had only monitored visits. The visits mother did have were plagued by issues such as mother bringing third parties to visits, including the friend who had interacted inappropriately with E.A., mother's efforts to coach E.A., and at times her inconsistency in visiting. The juvenile court had previously concluded that although mother completed programs, her long-term sobriety remained in question because of missed drug tests, and her lack of meaningful progress in her 12-step program.

On the other hand, the children were in a stable placement with the caregiver and had a bond and attachment to her. When DCFS first detained the twins they appeared to be suffering from undiagnosed developmental delays. They began receiving Regional Center services with the assistance of the caregiver. By November 2019, DCFS was able to report that the twins' speech had improved and their aggression had decreased. The caregiver was the adult who interacted with the children's service providers. J.R. and A.R. looked to the caregiver to provide security and care. In contrast, mother's bond with the twins was minimal. The social worker and the caregiver had to repeatedly encourage mother to attempt to develop her relationship with them.

E.A. likewise confided in the caregiver and referred to her as "mommy." After E.A. disclosed her memories about mother's male friend and what she had witnessed while in mother's care, she experienced anxiety, sleep issues, and "negative memories associated with her past trauma." By June 2020, E.A.'s mental

14

health services provider indicated she had made significant progress in mental health treatment, all while in the home of the caregiver. (See *In re D.R.* (2011) 193 Cal.App.4th 1494, 1512 [although bond with caregiver is not dispositive, disruption of an existing psychological bond between children and caretakers is an extremely important factor in 388 motion, citing *In re Jasmon O.* (1994) 8 Cal.4th 398, 408].)

Mother's 388 petition did not allege facts to rebut the presumption that continued foster care was in the children's best interests at this advanced stage of the proceedings. (*In re K.L, supra*, 248 Cal.App.4th at pp. 63–64.) The children were in a stable placement and had a secure attachment to the caregiver, who had attended to their specific needs. Mother had received nearly two years of services, yet still had only monitored visits with the children. She continued some form of relationship with the male friend with whom she had associated when using drugs, and who had been a source of emotional trauma for E.A. Mother also had a long history of drug abuse beginning when she was 14 years old; her many missed drug tests reasonably indicated to the court that her sobriety remained in question. (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 225 [chronic drug abuse presents a lifelong challenge and may put children of drug abusers in danger]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 205–206.) Delaying permanency to provide mother with further reunification services "would deprive [the children] of a permanent, stable home in exchange for an uncertain future." (*In re Ernesto R.*, at p. 225.)

Mother's unsupported statements that she could provide the children with a safe home and the children were bonded to her, did not constitute a prima facie case for returning the

children to mother's physical custody, providing further reunification services, or vacating the .26 hearing. "On the eve of a section 366.26 hearing, the child's interest in stability is the court's foremost concern, outweighing the parent's interest in reunification. Thus, a section 388 petition seeking reinstatement . . . of reunification services must be directed at the best interest of the child." (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348–1349.) Mother's allegations in the petition did not state reasons to show how delaying permanence and stability would be in the children's best interests. The juvenile court did not abuse its discretion in summarily denying the 388 petition. (See *In re Jackson W.* (2010) 184 Cal.App.4th 247, 260 [summary denial not abuse of discretion where petition made no showing of how the minors' best interests would be served by depriving them of a permanent, stable home in exchange for an uncertain future]; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

**DISPOSITION**

The juvenile court orders are affirmed.

NOT TO BE PUBLISHED.


ADAMS, J.*

We concur:


LAVIN, Acting P. J.


EGERTON, J.

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.