Filed 11/13/24  In re Oliver S. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re OLIVER S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>H.M. et al.,<br><br>　　Defendants and Appellants. | G064078<br><br>(Super. Ct. No. 22DP0231)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant H.M.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant D.S.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*　　　\*　　　\*

In February 2022, H.M. (Mother) gave birth to Oliver S. (Oliver), who tested positive for methamphetamine. The Orange County Social Services Agency (the Agency) filed a dependency petition. In July 2022, after jurisdiction and disposition hearings, the Orange County Juvenile Court (the court) removed Oliver from the custody of Mother and D.S. (Father).

In August 2023, the court terminated reunification services, set the matter for a permanency planning hearing (Welf. & Inst. Code, § 366.26),[1] and found that the Indian Child Welfare Act (ICWA) did not apply (both parents said they had no American Indian/Native American heritage).

In December 2023, on the day set for the section 366.26 hearing, Mother filed a petition seeking to reinstate reunification services alleging changed circumstances. (§ 388.) In February 2024, following a hearing, the court denied Mother's section 388 petition. The court found that while Mother was "sober currently, I would still categorize that as changing and not necessarily changed circumstances." In March 2024, the court conducted the section 366.26 hearing and terminated parental rights.

Mother claims the court abused its discretion by denying her section 388 petition. Father claims the court's ICWA ruling is not supported by substantial evidence. We find no errors and affirm the court's orders.

I.

FACTS AND PROCEDURAL HISTORY

On February 13, 2022, Oliver was born with methamphetamine withdrawal symptoms. Mother tested positive for methamphetamine. Prior to

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

Oliver's birth, Mother did not seek out any prenatal care. Mother had a criminal history, including narcotics charges. Mother was previously ordered to complete a drug program. Father had a criminal history involving narcotics offenses and domestic violence. The Agency determined Oliver's removal from the parents was necessary to ensure his safety and welfare. The Agency filed a juvenile dependency petition alleging failure to protect and no provision for support.

On February 18, 2022, the court conducted a detention hearing. Both parents completed forms under penalty of perjury stating that they had no American Indian/Native American heritage (the court's ICWA inquiries and findings will be covered in greater detail in the discussion section of this opinion). Mother did not have stable housing, had no provisions to care for Oliver, and had an active arrest warrant. Father had a history of substance abuse, domestic violence, and child endangerment, and had an active warrant. The court ordered temporary placement and care of Oliver with the Agency.

On July 18, 2022, the court conducted a combined jurisdiction and disposition hearing. The Agency reported Mother had expressed a willingness to enroll and participate in services, but she had failed to do so, and she had failed to submit to random drug testing. The court declared Oliver a dependent of the court, removed him from the parents' custody, and ordered family reunification services. Oliver was initially placed with his paternal grandmother, but was later placed with foster parents who were willing to adopt.

On August 15, 2023, the court conducted a review hearing. The Agency reported Mother had been arrested twice since the last hearing and was now pregnant. Mother's cooperation with her case plan was minimal,

and father's was none. Prior to being admitted to an inpatient treatment program in June 2023, Mother did not complete any programs (General Counseling, Domestic Violence, Parenting Education, Substance Abuse, etc.). Mother did not participate in any random drug testing (January through June 2023). Mother had abandoned her inpatient treatment program after admitting that she drank alcohol while on the premises. Mother's participation in parent-child visitation was inconsistent. The Agency reported that Oliver was healthy and doing well with his caregivers, who were willing to adopt. The court found "by clear and convincing evidence that reasonable services have been offered and provided to the parents. The extent of progress made towards alleviating or mitigating the cause of necessitating placement by the mother has been minimal and father has been none. The court orders reunification services to the parents are terminated." The court set the matter for a permanency planning hearing (§ 366.26) on December 12, 2023.

On November 29, 2023, the Agency filed a report in advance of the 366.26 hearing. The Agency stated Oliver was adoptable. The Agency recommended the court terminate parental rights. The Agency notified the court that Mother had given birth to a baby girl on November 2, 2023.

On December 12, 2023, Mother filed a section 388 petition seeking to reverse the August 2023 order terminating reunification services.

On January 8, 2024, the Agency filed a report in advance of the combined section 366.26 and section 388 hearing. The Agency recommended that Mother's section 388 petition be denied, and that parental rights be terminated. The Agency noted Mother is now required to participate in an inpatient treatment program, and stated its belief that Mother is only participating so she can "avoid jail time and not [in] her interest to reunifying with the child." The Agency noted Mother "was not around to participate in

4

any services or consistently participate in parent-child visitation during the first 15 months of the child's life; therefore, the . . . Agency does not believe the mother has developed any relationship with the child."

The Agency stated: "The time of the mother being sober is too short to tell whether the mother has successfully addressed her substance abuse issues . . . ." Mother had "not been forthcoming regarding her substance abuse and/or her involvement with the father . . . , [so] the agency is concerned that the mother will revert to her substance abuse issues and reconnecting with the father where she will give the father unauthorized access to the child." Mother "never participated in her random drug testing . . . prior to [being admitted] into the [residential program]. The mother is also unsure whether she can secure a stable home after exiting the sober living facility, and the Agency is concerned that the mother does not have a backup plan if she cannot secure her housing with the newborn . . . after exiting the sober living program."

In February 2004, the court conducted a section 388 hearing and denied Mother's petition (the hearing and the court's ruling will be covered in more detail in the discussion section of the opinion).

On March 28, 2004, the court conducted a section 366.26 permanency planning hearing, terminated parental rights, and ordered adoption as the permanent plan.

## II.

## DISCUSSION

Mother claims (A) the court erred by denying her section 388 petition; Father claims (B) the court erred by not ensuring the Agency had made adequate inquiries of family members under the ICWA. We disagree.

5

*A. Mother's Challenge to the Section 388 Ruling*

We review a juvenile court's section 388 ruling for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) We may reverse a court's denial of a section 388 petition only if we find the court has made ""''an arbitrary, capricious or patently absurd determination.''"" (*Ibid*.) We do not inquire whether substantial evidence would have supported a different ruling, nor do we reweigh the evidence, nor do we substitute our judgment for that of the court. (*Ibid*.)

In this discussion, we shall: 1) review relevant legal principles concerning section 388 petitions; 2) summarize the underlying proceedings; and 3) apply the law to the facts.

*1. Relevant Legal Principles*

"Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).)

"Under section 388, the petitioner must show by a preponderance of the evidence either changed circumstances or new evidence and that the proposed modification is in the best interests of the child." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

The best interests of the child in a section 388 proceeding "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "'A petition which alleges merely changing

6

circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests.'" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)

"'It is not enough for a parent to show *just* a genuine change of circumstances under [section 388]. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]' [Citation.] The fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor. [Citation.] Instead, 'a number of factors should be examined.' [Citation.] First, the juvenile court should consider 'the seriousness of the reason for the dependency . . . .' [Citation.] 'A second important factor . . . is the strength of the existing bond between the parent and child . . . .' [Citation.] Finally, as 'the essence of a section 388 motion is that there has been a change of circumstances,' the court should consider 'the nature of the change, the ease by which the change could be brought about, and the reason the change was not made before . . . .' [Citation.] 'While the bond to the caretaker cannot be dispositive . . . , our Supreme Court made it very clear . . . that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion.'" (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.)

### 2. Underlying Proceedings

Prior to the section 388 hearing, the Agency provided reports to the court, which explained that Mother had completed a 30-day inpatient substance abuse treatment program as a term of probation and was then living in a sober living facility. The report stated that if Mother were to

7

violate the terms of her probation, she would then have to serve 18 months in jail. The Agency noted that Oliver had never lived in Mother's care, their relationship was minimal, and it was unknown whether she was capable of meeting his needs.

The Agency reported that the prospective adoptive parents had been caring for Oliver for about six months. The Agency noted that Oliver had bonded with his foster parents, as well as their biological child. The Agency stated that the foster parents "are well equipped to care for the child. They have good insight into the child's emotional and developmental needs. They have strong parenting skills and provide a secure and nurturing environment for him. The family has the financial means to provide for all the child's needs. They have a strong support system to help them if the need arises. The prospective adoptive parents are physically healthy and active people. They have the time, energy and stamina to care for the child."

At the hearing, Mother conceded that the court's August 2023 order terminating reunification services was appropriate. She admitted she "never really followed up with any of the services" and "never really made any effort." Mother testified that her circumstances had changed since the birth of her daughter. Mother said she had bonded with her daughter and wished to have a chance to do so with her son. Mother testified she was currently on probation and in an intensive outpatient program with counseling and random drug testing. Mother testified that what has helped her stay clean is "being in a house full of women that also have kids and also deal with addiction."

The Agency's social worker Nathan Tran testified that he had been assigned to the case since August 2022. Tran said that the foster parents were chosen after taking into consideration Oliver's paternal

grandmother's request for Christian parents who were of Asian/Korean descent. Tran noted that Oliver calls the foster parents mom and dad in Korean. Tran said that in his observations of Oliver, he found him to be "very happy." Tran testified that the foster parents were able to provide for all of Oliver's needs, and he was attached to their five-year-old daughter.

After considering the parties' arguments, and when making its ruling, the court spoke directly to Mother:[2]

"I want you to know, I don't take these decisions lightly. I lose sleep over them. I think about them. I ponder them over and over again. But I am bound to follow the law. And here in determining whether you have carried your burden for the 388, I must consider the entire factual and procedural history of the case and whether the Court should modify a previously made order in this case to terminate family reunification services. It rests within the Court's discretion, and the determination may not be disturbed unless there's been a clear abuse of discretion. . . .

"And not every changed circumstance can justify modification of a prior order. So although your sobriety date that you cite as March of 2023, right now for the Court to determine that you had a changed circumstance, I still think is a little early. You testified that you did become sober, obviously, learning that you were pregnant with [your daughter]. I think that's a huge catalyst and motivation for you. And—but you have been in a very controlled environment. You haven't really left and/or been on your own or transitioned any sort of way to like an independent living. So the Court still determines that your circumstances, although you are sober currently, I would still categorize that as changing and not necessarily changed circumstances.

---

[2] We quote at length from the court's ruling.

9

"But the larger focus, I think what everyone is really focusing on right now, is once family reunification services are terminated, it really does shift to the stability that Oliver needs. The focus shifts away from the parent and into permanency and stability for Oliver. And I cannot in good conscience think that removing him now and placing him back with you would be in his best interest.

"Unfortunately, due to the circumstances . . . you testified obviously that even after having Oliver, he was taken from you. He has never been placed with you. You continue to [excuse] the circumstances around you visiting. And I'm not saying it wasn't easy obviously when Oliver was placed with paternal grandmother, but he wasn't your focus at that time like [your daughter] is your focus now.

"And I think that for his best interest—and I'm not considering —I'm not comparing the foster family to your situation by any means. I'm literally just looking at what's in his best interest. I do feel that just even looking at your bond with [your daughter] and your own testimony, you admitted it is different. You've had [your daughter] since birth. You raised her. There's a bond there that has developed through just the natural presence of her being so close to you.

"So the Court at this time is going to deny your 388 for those reasons. I don't believe you carried your burden, which is a preponderance of the evidence. And I don't believe it's in Oliver's best interest for the Court to grant the 388."

*3. Application and Analysis*

The court was plainly conversant with the appropriate legal principles, as demonstrated by its analysis of the factors it was required to

10

consider under section 388, and the court's emphasis on what was in Oliver's best interest. The court was also familiar with the relevant evidence, as demonstrated by its recitation of the pertinent facts involving Mother's changed circumstances since the date of its prior order, as well as Oliver's current circumstances as of the date of the hearing. The court then made what it admitted was a difficult decision, but a ruling that was plainly grounded in the appropriate law and the relevant facts.

In sum, we find that the court did not approach its decision in an arbitrary or capricious manner. Indeed, we find the court's analysis was well reasoned and empathetic. While we recognize that other courts may have ruled differently, we cannot find that the court in this case abused its discretion. Thus, we affirm the court's denial of Mother's section 388 petition.

Mother argues that *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), compels a different result. We disagree.

In *Kimberly F.*, the Agency was made aware of a home with unsanitary conditions where three children were present. (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 522–523.) The juvenile court sustained a petition, and the mother's two younger children (ages seven and 10) were removed from her custody and placed with relatives. (*Id.* at p. 523.) At the six and 12-month hearings, the Agency reported that the home remained unsanitary, but at the 18-month hearing, the Agency noted that "conditions in the house were improving." (*Id.* at p. 524.) Nonetheless, the court terminated reunification services and set a section 366.26 hearing, in part, because of the mother's resistance to therapy and her "'psychological disorder, the narcissistic personality.'" (*Ibid.*) Prior to the section 366.26 hearing, the mother filed a section 388 petition contending: "the house remained clean and safe"; she had been attending a parenting class, and a

11

support group; and a psychologist concluded that mother "did not exhibit any 'psychopathology.'" (*Id.* at p. 525.) Although the mother's contentions were essentially proven at a hearing, the juvenile court denied her section 388 petition and terminated parental rights. (*Id.* at p. 526.) The Court of Appeal reversed the juvenile court's section 388 ruling. (*Id.* at pp. 535–536.)

In *Kimberly F.*, the Court of Appeal stated a list of three factors, not meant to be exhaustive, that should be considered: (1) the seriousness of the problem leading to dependency; (2) the strength of relative bonds between the dependent children, both to the parent and the caretakers; and (3) the degree to which the problem may be easily removed or ameliorated. (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 530–532.) As to the first factor, the court found that: "A dirty house does not pose as intractable a problem as a parent's drug ingestion . . . ." (*Id.* at p. 532.) As to the second factor, the court found that as compared with the caretakers, "an undisputably strong bond exists between the mother and her children." (*Ibid.*) And as to the third factor, the court criticized "the juvenile court's narcissism rationale." (*Ibid.*) The appellate court concluded that: "We are not dealing here with real mental illness, but with a description of human personality." (*Id.* at p. 533.)

The facts in this case are readily distinguishable. As far as the first *Kimberly F.* factor, this case came to the attention of the Agency under extremely serious circumstances: Oliver was born with methamphetamine withdrawal symptoms, Mother had not sought prenatal care, she tested positive for methamphetamine, and she had no means to care for Oliver's basic needs. As far as the second factor, there was essentially no bond that had developed between Mother and Oliver. Conversely, Oliver's bond with the caretakers, and their child, was apparently very strong. And as far as the third factor, the court found that while Mother was "sober currently, I would

12

still categorize that as changing and not necessarily changed circumstances." That is, unlike the situation in *Kimerly F.*, Mother's problem that led to the dependency proceedings is not the type of problem that may be easily removed or ameliorated.

To reiterate and conclude, we cannot say that the court in any form or fashion abused its discretion. Thus, we affirm the court's denial of Mother's section 388 petition.[3]

## B. Father's Challenges to the ICWA Ruling

A juvenile court's ICWA orders are reviewed """"under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.""""" (*In re H.B.* (2023) 92 Cal.App.5th 711, 719.)

In this discussion, we shall: 1) review relevant legal principles regarding the ICWA; 2) summarize the underlying proceedings; and 3) apply the law to the facts.

### 1. Relevant Legal Principles

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for

---

[3] Mother also argues: "If the appellate court finds that the juvenile court erroneously denied mother's section 388 petition for modification, it must vacate all subsequent orders, including the order to terminate parental rights." Mother does not otherwise challenge the court's order to terminate parental rights at the section 366.26 hearing; therefore, given our disposition, we need not address that order.

removal of Indian children from their families, and by permitting tribal participation in dependency proceedings." (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) "An 'Indian child' is 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.'" (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1078.)

"The juvenile court and [the Agency] have 'an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child.' [Citations.] This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).)

The first phase applies in every juvenile dependency matter. (§ 224.2, subds. (a)–(c).) The ICWA provisions "impose an initial duty of inquiry upon [the Agency] and the juvenile court . . . to ask all relevant involved persons whether the child may be an Indian child." (*D.F., supra,* 55 Cal.App.5th at p. 568.)

The second phase only applies when the Agency "has *reason to believe* that an Indian child is involved in a proceeding, but does not have sufficient information to determine that *there is reason to know* that the child is an Indian child." (§ 224.2, subd. (e), italics added.) In such cases, the Agency "must satisfy three requirements—contacting the extended family, contacting the Bureau of Indian Affairs, and contacting the relevant tribes." (*D.F., supra,* 55 Cal.App.5th at p. 569.)

The third phase only applies if the inquiries in the first and second phases create a "'reason to know'" that the proceeding involves an Indian child. (*D.F., supra,* 55 Cal.App.5th at pp. 567–568.) In this phase, a

14

formal ICWA notice must be sent to the relevant tribe or tribes. (*Ibid.*) "The [formal ICWA] notice must contain sufficient information to enable the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.'" (*Id.* at p. 568.)

"A juvenile court's finding that ICWA does not apply . . . implies that (a) neither [the Agency] nor the court had a reason to know or believe the subject child is an Indian child; and (b) [the Agency] fulfilled its duty of inquiry." (*In re H.B.*, *supra*, 92 Cal.App.5th at p. 719.)

### 2. Underlying Proceedings

On February 17, 2022, the Agency filed a detention report that stated, in relevant part: "[Mother] denied any American Indian/Native American heritage. [¶] [Father] denied any American Indian/Native American heritage."

On February 18, 2022, the court conducted the detention hearing at which Mother and Father were present. Mother and Father had "completed and filed a Parental Notification of Indian Status (ICWA-020)." When asked about Indian ancestry under penalty of perjury, both parents checked a box indicating: "None of the above apply." The court "reviewed the ICWA-020 forms that were provided by each of the parents. Based on the Court's review, it does not appear that ICWA applies. So those ICWA-020 forms will be filed."

On June 29, 2022, to assess for Native American heritage, the Agency's social worker Tran sent two texts to Father requesting contact information for the paternal grandfather and paternal aunt, and also sent a text to paternal grandmother requesting contact information for the paternal grandfather and paternal aunt. Tran further completed a computer search on

15

Child Welfare Services.

Tran stated in a July 2022 report: "On July 5, 2022, the paternal grandmother was asked in-person during the compliance visit for the contact information for the paternal grandfather. She denied having this information stating that she has been separated from the paternal grandfather for some time. She said that they met in Korea and he is 'full Korean' with no Native American Heritage. The paternal grandmother was asked about the maternal aunt. The paternal grandmother refused to provide the information to contact the aunt . . . . The paternal grandmother reiterated that the paternal family are all 'full Korean.'"

On July 18, 2022, the court conducted a combined jurisdiction and disposition hearing. The court stated that it had "reviewed the record for compliance with ICWA, and based on the inquiry that was done, the Court finds that ICWA does not apply to these proceedings. To the extent any party has information that causes them to have a reason to know that the minor may be an Indian child, they are ordered to provide that information, but based on the record, that doesn't appear to be the case."

Tran stated in a January 2023 report: "On December 13, 2022, the mother denied having any Native American ancestry. [¶] On December 13, 2022, the father denied having any Native American ancestry. [¶] On December 12, 2022, the paternal grandmother denied having any Native American ancestry."

On January 17, 2023, the court's minutes for a review hearing state: "To comply with WIC § 224.2, [the Agency] shall make an initial inquiry of mother's two siblings. [The Agency] shall inquire if mother's two siblings have contact information for maternal grandparents. Parents are to provide contact information for extended family members to [the Agency]

16

forthwith. In the next report or an ex parte within 60 days, whichever comes soonest, [the Agency] shall document the results of the inquiries. The parties are to inform the Court if they subsequently receive information that provides reason to know the minor(s) is an Indian child."

On February 27, 2023, the court's minutes for a review hearing state: "[The Agency] shall make the initial inquiry ordered on January 17, 2023. Parents are to provide contact information for extended family members to [the Agency] forthwith. In the next report [the Agency] shall document the results of the inquiries. The parties are to inform the Court if they subsequently receive information that provides reason to know the minor(s) is an Indian child. The Court defers as to ICWA."

On July 10, 2023, the court's minutes for a review hearing state: "[The Agency] shall make the initial inquiry ordered on January 17, 2023. In the next report or an ex parte within 60 days, whichever comes soonest, [the Agency] shall document the results of the inquiries. The Court defers as to Indian Child Welfare Act (ICWA)."

On August 15, 2023, the court's minutes for a review hearing state: "Court finds the Indian Child Welfare Act (ICWA) does not apply. However, [the Agency] has an affirmative and continuing duty of inquiry."

On November 29, 2023, in advance of the permanency planning hearing, Tran summarized the ICWA inquires. Seven inquiries had been made of Mother, six inquiries had been made of Father, and five inquiries had been made of paternal grandmother.

On May 15, 2024, at the permanency planning hearing (§ 366.26), the court ruled that the "ICWA does not apply to these proceedings. The court is finding that the Agency has exercised due diligence within [its] efforts to make the required initial inquiries, and the court would note that the agency

17

has a continuing duty of inquiry of any extended family members that become known and the court is going to order the parties to inform the agency of [*sic*] any additional members, extended family members exists, and if they subsequently receive information that provides reason to note that the minor is an Indian child."

### 3. Application and Analysis

Mother and Father repeatedly reported to the Agency that they have no Indian ancestry, and they signed forms under penalty of perjury to that effect. The Agency interviewed the paternal grandmother who also repeatedly denied any Indian ancestry. The paternal grandmother informed the Agency "that the paternal family are all 'full Korean.'"

Therefore, we find that the juvenile court's finding that ICWA does not apply is supported by substantial evidence (i.e., there is no reason to know or believe that Oliver is an Indian child). (See *D.F., supra*, 55 Cal.App.5th at p. 569.)

As far as the adequacy of the ICWA inquiries, Mother "stated that she was born in South Korea." However, she was generally uncooperative with the Agency's repeated attempts to contact her family members. Mother "stated she has no family support in the United States and only has a family friend named Steve."

Here, we respectfully disagree with County Counsel's argument that the Agency "exhausted every lead to obtain the information the parents were ordered to provide 'forthwith.'" For instance, the Agency did not comply with the court's January 2023 order to contact Mother's siblings regarding whether they have reason to know Oliver may be an Indian child.

Nonetheless, given the fact that there was absolutely no

18

indication that Oliver was an Indian child, we find that the court's determination that the Agency had reasonably fulfilled its initial notice obligations under ICWA is supported by substantial evidence. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 610 ["the inquiry at the first step need not be exhaustive, as the goal is simply to ensure a reasonable inquiry"].)

Further, at the section 366.26 hearing, the court specifically notified the Agency of its "continuing duty of inquiry of any extended family members that become known and the court is going to order the parties to inform the agency of any additional members, extended family members exists, and if they subsequently receive information that provides reason to note that the minor is an Indian child."

Thus, we affirm the court's ICWA orders and findings.

### III.
### DISPOSITION

The orders are affirmed.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

GOODING, J.

19